# EXHIBIT "A"

CALIFORNIA ASSOCIATION OF REALTORS®

# BUYER COUNTER OFFER No. 1

(C.A.R. Form BCO, 11/14)

COLDWELL BANKER RESIDENTIAL BROKERAGE

Date *March 2, 2019*

This is a counter offer to the: [X] Seller Counter Offer No. *1*, [ ] Seller Multiple Counter Offer No. ____, [ ] or Other ____________ ("Offer"), dated *March 1, 2019*, on property known as *1020 E Providencia Ave, Burbank, CA 91501-1545* ("Property"), between *Petros Zargaryan, Kristine Shmavonyan* ("Buyer") and *David Seror, Chapter 7 Trustee* ("Seller").

1. **TERMS:** The terms and conditions of the above referenced document are accepted subject to the following:
   A. **Paragraphs in the Offer that require initials by all parties, but are not initialed by all parties, are excluded from the final agreement unless specifically referenced for inclusion in paragraph 1C of this or another Counter Offer or an addendum.**
   B. **Unless otherwise agreed in writing, down payment and loan amount(s) will be adjusted in the same proportion as in the original Offer.**
   C. **OTHER TERMS:** *Purchase price to be $ 1,350,000*
   D. **The following attached addenda are incorporated into this Buyer Counter offer:** [ ] Addendum No. ________ [ ] ________ [ ] ________

2. **EXPIRATION:** This Buyer Counter Offer shall be deemed revoked and the deposits, if any, shall be returned:
   A. Unless by 5:00pm on the third Day After the date it is signed in paragraph 3 (if more than one signature then, the last signature date)(or by ______ [ ] AM [ ] PM on ________ (date)) (i) it is signed in paragraph 4 by Seller and (ii) a copy of the signed Buyer Counter Offer is personally received by Buyer or *Steve Flores*, who is authorized to receive it.

OR B. If Buyer withdraws it in writing (CAR Form WOO) anytime prior to Acceptance.

3. **OFFER: BUYER MAKES THIS COUNTER OFFER ON THE TERMS ABOVE AND ACKNOWLEDGES RECEIPT OF A COPY.**

Buyer [signature] *Petros Zargaryan* Date 3/2/2019
Buyer [signature] *Kristine Shmavonyan* Date 3/2/2019

4. **ACCEPTANCE:** I/WE accept the above Buyer Counter Offer (**If checked** [ ] **SUBJECT TO THE ATTACHED COUNTER OFFER**) and acknowledge receipt of a Copy.

Seller [signature] *David Seror, Chapter 7 Trustee* Date 3/8/19 Time ______ [ ] AM/ [ ] PM
Seller ________________ Date ________ Time ______ [ ] AM/ [ ] PM

**CONFIRMATION OF ACCEPTANCE:**

(_____ / _____) (Initials) **Confirmation of Acceptance:** A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized agent as specified in paragraph 2A on (date) ____________ at ______ [ ] AM/ [ ] PM. **A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document.**

© 2014, California Association of REALTORS® Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**COUNTER-OFFER**

This agreement ("Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Petros Zargaryan and Kristine Shmavonyan (the "Buyer") from David Seror, solely in his capacity as Chapter 7 Trustee for Alliance Funding Group, Inc (the "Seller"), of the real property commonly known as 1020 Providencia Ave, Burbank, California (the "Property"). When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety the Purchase Agreement and Joint Escrow Instructions dated February 27, 2019 (the "Offer") and any oral or written negotiations since then.

PURCHASE PRICE; DEPOSIT; ESCROW. The purchase price for the Property shall be $1,330,000 ("Purchase Price"). Buyer shall make an initial deposit of $39,900 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable and delivered to A & A Escrow, Beverly Hills, California within two (2) business days of acceptance of this Counter-Offer by Buyer, Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A"; and Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement. Buyer shall deliver to the Trustee, within two (2) days of mutual agreement upon this Counter-Offer, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit; loan commitment or other form acceptable to the Trustee in the Trustee's sole discretion. In the event that either (i) Buyer fails timely to provide any such proof, or (ii) the Trustee determines, in the Trustee's sole discretion, that any proof of funds provided to Trustee by Buyer is unacceptable, the Trustee shall have the right, at the Trustee's option, to provide written notice to Buyer that this Counter-Offer is terminated. In the event that the Trustee exercises such termination right, this Counter-Offer shall terminate effective as of the date of Trustee's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Trustee shall each be relieved of any further obligation hereunder.

Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions. Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale. Buyer shall be free to assign this Agreement to another person or entity ("Assignee") subject to Seller's prior review and written approval (which approval Seller may grant or withhold in its sole discretion), but Buyer shall remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.

1. BUYER'S DUE DILIGENCE; CANCELLATION RIGHT. Buyer shall have twenty-one (21) calendar days from the date of execution hereof to perform, complete, and satisfy all contingencies, including, inspections, investigations, tests and reviews of reports, and to complete all due diligence which the Buyer desires for this Sale of the Property, including, but not limited to and performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer. Buyer may, not later than the end of that period, give Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or

dissatisfaction with the results of any of those matters ("Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit. If Buyer fails to give such Notice of Cancellation as within such period, all such contingencies shall be automatically removed and Buyer's obligation to proceed shall be non-contingent except as provided herein for, (i) Buyer's review of a preliminary report and underlying documents respecting the title to the Property (as set forth in Paragraph 2), and (ii) Bankruptcy Court approval of this Agreement and the Sale (including as set forth in Paragraph 6 ).

2. TITLE; TITLE INSURANCE. Within three (3) business days after acceptance of this Counter Offer First American Title (the "Title Company") or title company of Seller's choice will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review. Buyer may, not later than the end of the period in Paragraph 2, or until three (3) days after receipt of the preliminary report and underlying documents, whichever occurs later, in which to give Seller written notice ("Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use of the Property for the purpose for which it is currently used or intended to be used. Such notice must refer to the specific exception(s) in Schedule B of the preliminary report and the specific underlying document(s) which are the basis for Buyer's disapproval. Within five (5) business days after receipt of such notice, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the sale, in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the sale shall proceed. Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary report or providing title insurance coverage by endorsement against such exception(s). At the close of the sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary report, subject to any corrections as in this paragraph above, free and clear of all monetary liens, subject to the terms of the within contract. Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

3. REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION. If Buyer does not give Seller written Notice of Cancellation as and when provided in Paragraph 1, or Notice of Title Disapproval as and when provided in Paragraph 2, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale. Seller shall then file a motion with the Bankruptcy Court to confirm this sale. Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the sale, subject only to Bankruptcy Court confirmation as set forth below. If the Bankruptcy Court confirms the sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the sale, but no later than the first business day after fourteen (14) calendar days following the entry of court order approving sale. The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located. Occupancy shall be delivered to Buyer upon Escrow Holder's confirmation of recording.

4. BANKRUPTCY SALE. Buyer acknowledges that Seller is a Trustee appointed to administer the above referenced bankruptcy estate, and is a party to this Agreement solely in that capacity. Seller and Brokers and agents have not and will not determine the condition or fitness for use of the Property for any particular purpose. The sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Brokers or agents herein. Transfer of the

Property shall be by Quit Claim Deed. All parties acknowledge that Seller is a party to this Agreement solely in the capacity as Trustee of the above referenced bankruptcy estate and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against the Seller, Trustee or the estate in connection with this transaction, the Trustee shall in no event have any personal liability whatsoever (whether in her individual capacity or otherwise), it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of such estate.

5. TAXES; PRORATIONS; COSTS OF SALE. All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer. The sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the sale. Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located. Seller shall pay any real property transfer tax. Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements. Buyer shall pay the cost of recording the deed. Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

6. BANKRUPTCY COURT APPROVAL; OVERBIDDING. The sale is subject to notice to creditors, approval by the Bankruptcy Court, and higher and better bids received by Seller through and including the Bankruptcy Court hearing to confirm the sale. Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so.

7. BROKERS. Seller is represented by Coldwell Banker. Buyer is represented by Coldwell Banker. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 6% of net sales price of the Property to the Brokers as follows: 3% to Coldwell Banker and 3% to Coldwell Banker in connection with the closing of this sale. All such Brokers and agents are collectively referred to herein as the "Brokers." No commission or compensation shall be due or payable to Brokers in connection with this Agreement or sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder or other person entitled to any fee, commission or other compensation in connection with the Sale and Buyer shall indemnify, defend and protect and hold Seller and the related bankruptcy estate harmless of, from and against any claims, demands, actions, causes of action, losses, liabilities and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions or other compensation of any kind are hereafter asserted.

8. MATERIAL CHANGE OF CONDITION. In the event of any material change in the

condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (a) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the full Deposit shall be refunded to Buyer; or (b) make required repairs at the bankruptcy estate's expense; or (c) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the sale; or (d) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart 9(b), (c) or (d), Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property.

9. REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE. Buyer's sole remedy in the event that the sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Deposit (plus any increase thereof by Buyer). In the event Buyer fails to close the sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under Paragraphs 2 and 3, Buyer's Deposit (plus any increase, thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than three percent of the Purchase Price. This provision shall apply equally to the Deposit (and any increase, thereof by Buyer).

PZ KS [Buyer's Initials]

10. BANKRUPTCY COURT JURISDICTION. The U.S. Bankruptcy Court for the Central District of California shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction. This Agreement shall be interpreted and enforced pursuant to the laws of the United States of America including the Bankruptcy Code, Title 11, United States Code.

11. "AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES. Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement. Seller and Brokers and agents herein have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) value of the Property; (ii) income to be derived from the Property; (iii) suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) manner, quality, state of repair, or lack of repair of the Property; (vi) nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) compliance or lack of

compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S. Code §§9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S. Code §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S. Code §§6901, et seq.), the Toxic Substance Control Act (15 U.S. Code §2601, et seq.), the Clean Water Act (33 U.S. Code §1251, et seq.), California Health and Safety Code §25117 or 25316), or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any Due Diligence materials or Preliminary Report regarding Title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter. Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Broker, has provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Broker shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

12. BROKERS. Brokers and agents herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer. In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Brokers or agents herein, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

13. OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE. Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property. In deciding to proceed with the sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller. Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller

with respect to the Property was obtained from a variety of sources and that neither Seller nor the Brokers and agents herein nor any other person has made or makes any representations as to the accuracy or completeness of such information. Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Brokers or agents from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation. NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER. Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

14. PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS.

A. BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED PROFESSIONALS SELECTED BY BUYER. Seller and Brokers and agents herein strongly recommend that Buyer fully exercise and not waive such inspections and investigations.

B. Buyer shall select and employ, at Buyer's expense, a licensed engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s), environmental consultant(s), or other qualified professional(s) to make inspection(s) and investigations of the Property, including, but not limited to, (i) its general structure, plumbing, heating, air conditioning (if any), electrical system, built-in appliances, cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool, spa, related equipment and filters, sprinklers, and those other matters affecting the desirability of the Property (all if and only to the extent any such structures, systems, and components are presently a part of the Property); (ii) any actual or potential wood destroying pests or other conditions damaging to the Property or any portion thereof; (iii) environmental hazards, substances, products, or conditions, including without limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water, fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas, any of which may constitute a health risk; (iv) the presence or absence of any required governmental permits, inspections, applications, approvals, and certificates of occupancy, and compliance or lack of compliance with building codes and laws applicable to the Property; (v) plans and specifications for the Property; (vi) all applicable zoning, municipal, county, state, and federal, including those affecting the past, current, or any future use of the Property; (vii) deed restrictions and other matters of public record which may govern, restrict, condition, or prohibit the use, alteration, or development of the Property; and (viii) generally, without limitation, any and all other items and matters of whatsoever nature, character, or description, which Buyer deems material to Buyer's interests, in, on, or affecting the Property; and to approve or disapprove said inspection within the period and in the manner set forth in this agreement.



245416X

15. COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES. Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements or improvements except as may otherwise be expressly stated herein. Without limiting any other provision hereof, Buyer represents, warrants and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

16. WRITTEN AFFIRMATION OF SELLER REQUIRED. Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several Counter-Offers concurrently containing the same or different terms. This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's Affirmation of Agreement attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement. Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, to negotiate, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

17. <u>ATTORNEYS' FEES</u>. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

18. Property shall be vacant at close of escrow

**EXPIRATION OF COUNTER-OFFER. This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller on or before close of business March 4, 2019. Such acceptance shall nevertheless be subject to Paragraph 16.**

**AGREED AND ACCEPTED:**

**"BUYER"**

**Dated:** 3/2/2019

See attached BCO 1

**By:**

Petros Zargaryan and Kristine Shmavonyan

**"SELLER"** **(subject to Paragraph 16)**

**Dated:** 3/1/19

**By:**

**David Seror, solely in his capacity as Chapter 7 Trustee for Alliance Funding Group, Inc**

EXHIBIT "A"

SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and rights any of overbidders. Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this agreement.

"SELLER"

Dated: 3/6/19

By: ______________________

David Seror, solely in his capacity as Chapter 7 Trustee for Alliance Funding Group, Inc

A&A
ESCROW SERVICES, INC.

415 N. Crescent Drive, Suite 320
Beverly Hills, CA 90210

Phone: (310) 550-6055
Fax: (310) 550-6130

Antonia Delgado
Sr. Escrow Officer

Date: March 29, 2019
Escrow No.: 104427-AA

**AMENDED ESCROW INSTRUCTIONS**

Property Address: 1020 E. Providencia Ave., Burbank, CA 91501

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

(1) Buyer hereby approves and removes all of Buyer's contingencies in this escrow.

(2) At close of escrow from funds accrued to Seller's account, Escrow Holder is hereby authorized and instructed to **DEBIT** the account of the **SELLER** and **CREDIT** the account of the **BUYER** with the sum of **$15,000.00**. Said sum shall be applied towards **Buyer's recurring and non-recurring closing costs.**

Buyer and Seller agree to indemnify, defend and hold Escrow Holder, its agents, officers, directors, Real Estate Brokers and its agents, free and harmless from any/all liability or loss in connection with this instruction.

(3) Buyer and Seller herein acknowledge that the purchase price of subject property has been **REDUCED** and therefore authorize and instruct Escrow Holder to amend the PURCHASE PRICE to be **$1,345,000.00.**

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ____________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

____________________
Petros Zargaryan

____________________
Kristine Shmavonyan

ESCROW SERVICES, INC.

415 N. Crescent Drive, Suite 320
Beverly Hills, CA 90210

Phone: (310) 550-6055
Fax: (310) 550-8130

Antonia Delgado
Sr. Escrow Officer

Date: March 29, 2019
Escrow No.: 104427-AA

**AMENDED ESCROW INSTRUCTIONS**

Property Address: 1020 E. Providencia Ave., Burbank, CA 91501

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

(1) Buyer hereby approves and removes all of Buyer's contingencies in this escrow.

(2) At close of escrow from funds accrued to Seller's account, Escrow Holder is hereby authorized and instructed to **DEBIT** the account of the **SELLER** and **CREDIT** the account of the **BUYER** with the sum of **$15,000.00**. Said sum shall be applied towards **Buyer's recurring and non-recurring closing costs.**

Buyer and Seller agree to indemnify, defend and hold Escrow Holder, its agents, officers, directors, Real Estate Brokers and its agents, free and harmless from any/all liability or loss in connection with this instruction.

(3) Buyer and Seller herein acknowledge that the purchase price of subject property has been **REDUCED** and therefore authorize and instruct Escrow Holder to amend the PURCHASE PRICE to be **$1,345,000.00.**

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

A&A
ESCROW SERVICES, INC.

415 N. Crescent Drive, Suite 320
Beverly Hills, CA 90210

Phone: (310) 550-6055
Fax: (310) 550-6130

**A & A ESCROW SERVICES, INC. IS LICENSED BY THE DEPARTMENT OF BUSINESS OVERSIGHT OF THE STATE OF CALIFORNIA, LICENSE NUMBER 963 2597**

## ADDENDUM TO COUNTER OFFER DATED MARCH 6, 2019

Antonia Delgado
Sr. Escrow Officer

**Escrow No.:** 104427-AA
**Date:** March 6, 2019

Petros Zargaryan and Kristine Shmavonyan, (herein known as Buyer) hereby acknowledge his/her agreement to purchase from Bankruptcy Estate of Alliance Funding Group, Inc., (herein known as Seller), the real property set forth hereinbelow per terms, conditions, consideration and instructions hereinafter stated. We, the undersigned, hand you a copy of the Counter Offer dated March 6, 2019 and Buyer Counter Offer No. 1, dated March 2, 2019, (originals of which have been executed by all parties and retained by broker). **Date of Acceptance: March 6, 2018**.

### TERMS OF TRANSACTION

Buyer will hand A & A ESCROW SERVICES, INC. initial deposit in the amount of ........ 40,500.00
Prior to close of escrow, buyer will deposit a balance of down payment in the sum of ........ 1,309,500.00

**Total Consideration** ........ **$1,350,000.00**
Together with closing costs and funds necessary to close this transaction.

Furthermore, I/We will execute and deliver any instruments and/or funds which this escrow requires to show title as called for, all of which you are instructed to use provided you hold a policy of title insurance with the usual title company's exceptions, issued by **First American Title Company** with a liability of not less than **$1,350,000.00**, covering property described as follows:

**SCHEDULED CLOSE OF ESCROW: The CLOSE OF ESCROW shall be as soon as practicable after the entry of the order by the Bankruptcy Court approving the sale of the property, but no later the first business day after the fourteen (14) calendar days following the entry of the Sale Order.**

LEGAL DESCRIPTION AS FURNISHED BY INSURING TITLE COMPANY

**A RESIDENTIAL PROPERTY**, WHICH PROPERTY SELLER REPRESENTS IS COMMONLY KNOWN AS:
**1020 E. Providencia Ave., Burbank, CA 91501**
**ASSESSORS PARCEL NUMBER: 5620-003-029**

**TITLE POLICY TO SHOW TITLE VESTED IN:** Petros Zargaryan and Kristine Shmavonyan (exact vesting to be furnished in writing as soon as possible to provide for the drawing of necessary documents)

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

Date: March 6, 2019 Escrow No.: 104427-AA

Page 2 of 13: Additional instructions made a part of previous pages as fully incorporated therein.

**FREE FROM ENCUMBRANCES EXCEPT:**

(1) All General and special Taxes for the fiscal year 2019 through 2020, including bonds, special assessments, assessed against former owner, and/or supplemental taxes assessed pursuant to the provisions of Chapter 498, Statutes of the State of California. (Change of Ownership will affect the taxes to be paid. A Supplemental Tax Bill will be issued and BUYER accepts all responsibility for all additional taxes due because of said reassessment. TAX BILLS ISSUED AFTER THE CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYERS AND SELLERS.)

(2) Covenants, conditions, restrictions, reservations, rights, rights of way, and easements, and any oil, gas, or mineral reservations now of record, if any.

**INSTRUCTIONS TO ESCROW:**

(1) **CLOSING FUNDS:** Each party acknowledges that the close of escrow is conditioned on check clearances. All funds required to be deposited for the close of escrow must be in the form of a **direct electronic "wire" transfer** to **A & A Escrow Services, Inc.** Trust Account, and be deposited at least two (2) business days prior to close of escrow. **(PLEASE CONTACT ESCROW HOLDER FOR WIRING INSTRUCTIONS AND CALL TO VERIFY PRIOR TO INITIATING THE WIRE TRANSFER).**

(2) **IN THE EVENT** EITHER PARTY REQUESTS CANCELLATION OF THIS ESCROW AT ANY TIME, ALL PARTIES ARE AWARE THAT THIS ESCROW WILL NOT BE CONSIDERED CANCELLED, AND NO FUNDS WILL BE DISBURSED UNTIL ESCROW HOLDER HAS RECEIVED MUTUALLY SIGNED CANCELLATION INSTRUCTIONS FROM BUYERS AND SELLER.

(3) **PRORATIONS:** Prorate as of Close of Escrow

- Real Property taxes based on latest tax bill or on amount furnished by title company.

THESE ESCROW INSTRUCTIONS ARE NOT INTENDED TO SUPERSEDE THE REAL ESTATE PURCHASE CONTRACT AND RECEIPT FOR DEPOSIT, BUT TO CARRY OUT ITS TERMS AND CONDITIONS IN CONSUMMATING THE PURCHASE AND SALE, EXCEPT AS MAY BE AMENDED OR MODIFIED BY THE MUTUAL WRITTEN INSTRUCTIONS OF THE PARTIES.

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW, SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

Date: March 6, 2019 Escrow No.: 104427-AA



**GENERAL PROVISIONS**

1. **AGREEMENT TO BE BOUND BY GENERAL PROVISIONS:** The Parties agree to execute these instructions and any supplemental instructions presented by Escrow Holder confirming their agreement to be bound to any additional terms and conditions of Escrow Holder, including Escrow Holder's general provisions, and authorize Escrow Holder to resign from processing this escrow transaction if mutual agreement cannot be reached between the Parties and Escrow Holder relative to the terms and conditions of Escrow Holder's duty.

2. **COMMENCEMENT OF ESCROW HOLDER DUTY:** This escrow transaction is deemed open, and Escrow Holder's duty commences, upon receipt of mutual or matching escrow instructions, signed by all Parties and the initial, good faith deposit are deposited with Escrow Holder. Said escrow instructions shall be incorporated in the purchase agreement or, if the purchase agreement does not include escrow instructions or no purchase agreement is entered into by the Parties, shall be drafted by Escrow Holder at the direction of the Parties.

3. **DUTIES OF ESCROW HOLDER:** The Parties agree that Escrow Holder has only those responsibilities inherent of an escrow service provider and that there are no other legal relationships established between Escrow Holder and the Parties by way of this escrow transaction. Those duties are limited to the safekeeping of such money and documents received by Escrow Holder and for the disposition and/or disbursement of same in accordance with the written instructions accepted by Escrow Holder in this Escrow. Escrow Holder shall not be liable for any damages, losses, costs, or expenses incurred by any Party in the handling and processing of this escrow transaction as a result of any act or failure to act made or omitted in good faith or for any action taken that Escrow Holder shall in good faith believe to be genuine, excepting such as may arise through or be caused by Escrow Holder's willful neglect or gross misconduct.

4. **PROMISE TO PAY AND INDEMNIFY:** The Parties hereby jointly and severally promise and agree to pay promptly on demand, as well as to indemnify Escrow Holder and hold Escrow Holder harmless from and against all litigation and interpleader costs, damages, judgments, attorney's fees, expenses, obligations, and liability of every kind which in good faith Escrow Holder may incur or suffer in connection with or arising out of this escrow transaction, whether said litigation, interpleader, obligation, liability or expense arises during the performance of this escrow transaction or subsequent thereto, directly or indirectly. The Parties agree to pay Escrow Holder a reasonable fee for all time spent by officers or employees of Escrow Holder in connection with any dispute resolution action taken relative to this escrow transaction including but not limited to time spent researching, reviewing and/or testifying relative thereto.

5. ATTORNEY'S FEES: **IF ESCROW HOLDER REQUIRED TO RESPOND TO ANY LEGAL SUMMONS OR PROCEEDING OR IF ANY ACTION IN INTERPLEADER OR DECLARATORY RELIEF IS BROUGHT BY OR AGAINST ESCROW HOLDER, THE PARTIES JOINTLY AND SEVERALLY AGREE TO PAY ALL COSTS, EXPENSES AND REASONABLE ATTORNEY 'S FEES EXPENDED OR INCURRED BY ESCROW HOLDER. A LIEN IS HEREBY CREATED IN ESCROW HOLDER'S FAVOR TO COVER SAID ITEMS.**

**IN THE EVENT ANY PARTY TO THIS ESCROW TRANSACTION, OR ESCROW HOLDER, INSTITUTES OR DEFENDS ANY LITIGATION ARISING OUT OF THIS ESCROW TRANSACTION, AT LAW OR IN EQUITY, THE PREVAILING PARTY, AS DETERMINED BY THE COURT, SHALL, IN ADDITION TO SUCH OTHER RELIEF AS MAY BE AWARDED, BE ENTITLED TO RECOVER REASONABLE ATTORNEYS' FEES, COSTS, AND EXPENSES OF SUCH LITIGATION.**

If any party to this transaction shall require any of the officers, agents, and/or employees of Escrow to respond to any subpoena or other order to appear in the action or proceeding in which Escrow's breach or fault is not an issue, the party requiring such appearance agrees to indemnify and hold Escrow harmless from and against all costs, expenses and

| **SELLERS:** | **BUYERS:** |
|---|---|
| Bankruptcy Estate of Alliance Funding Group, Inc. | Petros Zargaryan |
| By: ______________________ David Seror, solely in his capacity as Chapter 7 Trustee | Kristine Shmavonyan |

Date: March 6, 2019 Escrow No.: 104427-AA

Page 4 of 13: Additional instructions made a part of previous pages as fully incorporated therein.

reasonable attorneys' fee expended or incurred by Escrow in connection with such appearance. The party requiring such appearance shall pay to Escrow of such officer, agent or employee, in addition to the amounts from time to time provided by law, the sum of $300.00 as witness fees for each day or part thereof that the officer, agents or employees attend of Escrow is actually required to attend. As a condition precedent to the obligation of Escrow and the obligation of any of its officers, agents or employees attend pursuant to such subpoena or order, the party requiring such appearance shall, concurrently with the service of the subpoena or order, pay to the party required to attend to fee to which he or it is entitled hereunder for one (1) day's actual attendance.

6. **UNJUST ENRICHMENT:** In the event any Party to this escrow transaction received funds or is credited funds to which they are not entitled, said Party agrees, upon written demand, to return said funds immediately to escrow for correct disbursement.

7. **DEPOSIT OF FUNDS:** Escrow Holder is instructed to deposit all funds received by Escrow Holder with any state or national bank in a trust account in the name of Escrow Holder, without any liability for payment of interest. All deposits made by personal check, cashier's check, certified check, or deposit other than wire transfer are subject to clearance and payment by the financial institution upon which they are drawn. Funds deposited with Escrow Holder in the form of check or similar instrument will be identified as collected funds when the Escrow Holder's financial institution confirms that the funds are available for disbursement.

**BE ADVISED THAT CYBER CRIMINALS ARE USING PHISHING TECHNIQUES (AKA USING THE INTERNET TO ACQUIRE SENSITIVE INFORMATION SUCH AS USERNAMES, PASSWORDS, AND CREDIT CARD DETAILS AND SOMETIMES, INDIRECTLY, MONEY, OFTEN FOR MALICIOUS REASONS, BY MASQUERADING AS A TRUSTWORTHY ENTITY IN AN ELECTRONIC COMMUNICATION) TO TRY AND DIVERT WIRES COMING INTO AND GOING OUT OF ESCROW COMPANIES. TO AVOID SUCH SCAMS, PRIOR TO SENDING ANY WIRE TO ESCROW HOLDER, THE WIRING PARTY MUST CONTACT ESCROW HOLDER TO CONFIRM THE APPROPRIATE WIRING INSTRUCTIONS.**

8. **GOOD FUNDS LAW:** Pursuant to California Insurance Code Section 12413.1, known as the Good Funds Law, the Parties hereto are made aware that closing funds deposited by the Parties and/or lender must be cleared funds prior to close of escrow. This law places some very specific constraints upon the time frames for funds to be made available for disbursement. Close of escrow cannot occur before funds are cleared and immediately collectible and available for withdrawal, which clearance can range from being immediately available upon receipt to seven (7) days depending on the form deposit. The Parties hereby release Escrow Holder of any responsibility, claim, and/or liability in connection with such a delay caused by the manner in which closing funds or lender's funds are deposited.

9. **RELEASE OF FUNDS:** In the event the Parties to this escrow transaction instruct Escrow Holder to release funds prior to close of escrow, regardless of the fact that this escrow transaction has not closed and/or documents are not yet recorded, the Parties hereby release, relieve, indemnify and agree to hold harmless Escrow Holder from any and all liability and/or responsibility, both legally and equitably, which may arise, including but not limited to any legal actions, attorney's fees, costs or claims of any kind, either now, during the course of this escrow transaction, or subsequent to the close of this escrow transaction by reason of Escrow Holder complying with said release of funds, and Escrow Holder shall not be responsible to assist in the recovery of same in the event that this escrow transaction is not consummated. Escrow Holder is authorized to release funds, if applicable, from money on deposit to pay for any credit report, appraisal, City Report, lender, or association statement, demand, transfer fees or documents which may be required to be paid in advance of closing. Funds released prior to the close of escrow are non-refundable regardless of the consummation of this escrow.

| SELLERS: | BUYERS: |
|---|---|
| Bankruptcy Estate of Alliance Funding Group, Inc. | ____________________ Petros Zargaryan |
| By: ____________________ David Seror, solely in his capacity as Chapter 7 Trustee | ____________________ Kristine Shmavonyan |

Date: March 6, 2019 Escrow No.: 104427-AA

Page 5 of 13: Additional instructions made a part of previous pages as fully incorporated therein.

10. **COSTS AND CHARGES:** From funds due Seller at the close of escrow, deduct and pay encumbrances of record, plus accrued interest, charges and prepayment penalties, if any, bonds and/or assessments, and any delinquent monthly installment(s) on existing encumbrance(s) as disclosed by beneficiary statement(s), and any county and/or city transfer fees, costs and charges in this transaction which may include, but are not limited to: the Owner's Policy of title insurance, documentary transfer tax, reconveyance fees, recording fee's, Seller's customary escrow fees, fees for preparation, notarization and recording of documents as necessary on Seller's behalf, wire fees, messenger and overnight delivery fees, Seller's portion of the sub-escrow fee, and Broker compensation as per separate agreement.

Buyer agrees to pay all Buyer's usual costs and charges in this transaction which may include, but are not limited to: Buyer's customary escrow fees, document preparation fees, email document fees, wire fees, messenger and overnight delivery fees, all fees and charges in connection with the new loan(s), Buyer's portion of the sub-escrow fee, recording charges, and inspection fees.

11. **ARCHIVE FEE:** The Parties are advised that Escrow Holder charges an archive fee of $50.00 for each refinance escrow transactions, $50.00 for sale transactions charged to each buyer and seller side, and $8.00 for any file that cancels for the purpose of managing and maintaining records of this escrow transaction as required by California law.

12. **STATUTE OF LIMITATIONS:** These instructions are to be construed and interpreted according to California Law. NO ACTION SHALL LIE AGAINST ESCROW HOLDER FOR ANY CLAIM, LOSS, LIABILITY OR ALLEGED CAUSE OF ACTION OF ANY KIND OR NATURE WHATSOEVER, HOWEVER CAUSED OR OCCURRED, IN THIS ESCROW TRANSACTION OR IN CONNECTION WITH THE HANDLING OR PROCESSING OF THIS ESCROW TRANSACTION, UNLESS BROUGHT WITHIN TWELVE (12) MONTHS AFTER THE CLOSE OF ESCROW OR ANY CANCELLATION OR TERMINATION OF ESCROW FOR ANY REASON WHATSOEVER.

13. **WRITTEN INSTRUCTIONS REQUIRED:** Pursuant to California Civil Code Section 1624, no notice, demand, supplemental escrow instruction, or amendment of the escrow instructions (hereinafter collectively "supplemental instructions") shall be effective unless given in writing by the Parties affected thereby. Escrow Holder shall not act upon or consider such supplemental instruction to have any validity until same is fully executed and delivered to Escrow Holder by all Parties concerned.

14. **AUTHORIZATION TO ACCEPT ELECTRONIC SIGNATURES AND DOCUMENTS:** In accordance with California's Uniform Electronic Transactions Act (the "Act"), the Parties hereby authorize Escrow Holder to accept electronic and/or digital signatures and records, transmitted via facsimile or other electronic means (collectively "electronic signatures") into this escrow as originals. The Parties expressly agree that this transaction can be conducted electronically, at the option of the Parties, to the fullest extent possible under the Act and recording laws. The Parties agree to transmit original, wet signatures on (1) all documents to be recorded, (2) all documents excluded from being enforceable under the Act, and (3) all documents required to be in original form by any regulatory agency. The Parties agree to verify any and all electronic signatures upon request of Escrow Holder.

15. **ACTS OUTSIDE OF ESCROW AND MEMORANDA ITEMS:** Whenever provision is made herein for the payment of any sum, the delivery of any document, or the performance of any act "outside of escrow", Escrow Holder shall have no responsibility therefor, shall not be concerned therewith, and is specifically relieved of any obligation relative thereto. Escrow Holder is expressly instructed not to act upon or be concerned with or liable for those items designated in the purchase agreement, escrow instructions, or supplemental instructions as memoranda items between the Parties, nor any other agreement between the Parties not expressly addressed to Escrow Holder in the form of a supplemental instruction.

16. **NO DUTY TO DISCLOSE OR INSPECT:** Escrow Holder's sole duty relative to disclosures shall be the payment

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

of invoices presented to Escrow Holder. Escrow Holder is not to be concerned with the giving of any disclosures except as expressly required to be given by an escrow service provider pursuant to Federal or State law, including but not limited to those disclosures related to lending, zoning, land division, property condition, or usury. Neither will Escrow Holder conduct any lien search or title searches relative to personal property in connection with the sale or transfer of personal property through this escrow transaction, if any. Escrow Holder urges the Parties to seek appropriate counsel from an attorney or licensed broker to ascertain what disclosures and/or laws, if any, need to be complied with prior to close of escrow. The Parties jointly and severally agree to indemnify and hold harmless Escrow Holder by reason of any misrepresentation or omission by a Party or agents or failure of the Parties to this escrow transaction to comply with the rules and/or regulations of any governmental agency, whether state, federal, county, municipal, or otherwise and Escrow Holder is not to be concerned with enforcement of same. If presented with an invoice in connection with any disclosure Escrow Holder is authorized to pay same without further instructions. Escrow Holder will make no physical inspection of the real property and/or personal property that is the subject of this escrow transaction, and Escrow Holder is not to be concerned with or liable for the condition of same.

**17. FEDERAL TAX REPORTING:** The Parties acknowledge their awareness of the fact that, upon transfer of property, Escrow Holder must provide information pertaining to the escrow transaction to the Internal Revenue Service as required by Internal Revenue Code Section 6045(e) relative to the production of 1099 forms. The Parties agree to provide Escrow Holder all information necessary to produce the tax reporting documentation in compliance with Federal Law.

**18. FEDERAL TAX WITHHOLDING:** The sale of a U.S. real property interest by a foreign person is subject to the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA") income tax withholding. This law authorizes the United States to tax foreign persons on the sale of U.S. real property interests. Persons purchasing U.S. real property interests from foreign persons, certain purchasers' agents, and settlement officers may be required to withhold a portion of the amount realized. Withholding is intended to ensure U.S. taxation of gains realized on disposition of such interests. The purchaser is liable if the withholding is not made when required. The Parties agree to execute and deliver to Escrow Holder any instrument, affidavit and statement or to perform any act reasonably necessary to carry out the provisions of FIRPTA and regulations promulgated thereunder.

**19. STATE TAX WITHHOLDING:** The following disclosure is being provided pursuant to California law for all escrow transactions wherein a transfer of title is being completed as part of the escrow transaction. In accordance with Section 18662 of the Revenue and Taxation Code, a buyer may be required to withhold an amount equal to 3⅓ percent of the sales price, or an optional gain on sale withholding amount certified by the seller in the case of a disposition of California real property interest by either: (a) A seller who is an individual, trust, estate, or when the disbursement instructions authorize the proceeds to be sent to a financial intermediary of the sellers; or (b) A corporate seller that has no permanent place of business in California immediately after the transfer of title to the California property. The buyer may become subject to penalty for failure to withhold an amount equal to the greater of 10 percent of the amount required to be withheld or five hundred dollars ($500). However, notwithstanding any other provision included in the California statutes referenced above, no buyer will be required to withhold any amount or be subject to penalty for failure to withhold if any of the following apply: (a) The sale price of the California real property conveyed does not exceed one hundred thousand dollars ($100,000); (b) The seller executes a written certificate, under the penalty of perjury, certifying that the seller is a corporation with a permanent place of business in California; (c) The seller, who is an individual, trust, estate, or a corporation without a permanent place of business in California, executes a written certificate, under the penalty of perjury, of any of the following: (i) The California real property being conveyed is the seller's or decedent's principal residence (within the meaning of Section 121 of the Internal Revenue Code (IRC)); (ii) The last use of the property being conveyed was use by the transferor as the transferor's principal residence (within the meaning of IRC Section 121); (iii) The California real property being conveyed is, or will be, exchanged for property of like kind (within the meaning of IRC Section 1031), but only to the extent of the amount of gain not required to be recognized for California income tax

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

purposes under IRC Section 1031; (iv) The California real property has been compulsorily or involuntarily converted (within the meaning of IRC Section 1033) and the seller intends to acquire property similar or related in service or use so as to be eligible for nonrecognition of gain for California income tax purposes under IRC Section 1033; or (v) The California real property transaction will result in a loss or net gain not required to be recognized for California income tax purposes. The seller is subject to penalty for knowingly filing a fraudulent certificate for the purpose of avoiding the withholding requirement.

**20. SUPPLEMENTAL PROPERTY TAXES: PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1102.6C, THE FOLLOWING DISCLOSURE IS HEREBY PROVIDED: "CALIFORNIA PROPERTY TAX LAW REQUIRES THE ASSESSOR TO REVALUE REAL PROPERTY AT THE TIME THE OWNERSHIP OF THE PROPERTY CHANGES. BECAUSE OF THIS LAW, YOU MAY RECEIVE ONE OR TWO SUPPLEMENTAL TAX BILLS, DEPENDING ON WHEN YOUR LOAN CLOSES. THE SUPPLEMENTAL TAX BILLS ARE NOT MAILED TO YOUR LENDER. IF YOU HAVE ARRANGED FOR YOUR PROPERTY TAX PAYMENTS TO BE PAID THROUGH AN IMPOUND ACCOUNT, THE SUPPLEMENTAL TAX BILLS WILL NOT BE PAID BY YOUR LENDER. IT IS YOUR RESPONSIBILITY TO PAY THESE SUPPLEMENTAL BILLS DIRECTLY TO THE TAX COLLECTOR. IF YOU HAVE ANY QUESTIONS CONCERNING THIS MATTER, PLEASE CALL YOUR LOCAL TAX COLLECTOR'S OFFICE."**

If there is an impound account for taxes, the borrower is advised to inquire with the lender to determine if the supplemental tax bill will be paid by the lender from the impound account. Tax bills issued AFTER the close of escrow shall be handled or prorated directly between the Parties outside of escrow. Escrow Holder shall prorate taxes at the close of escrow based on the latest available tax statement and is relieved of any and all liability for taxes and/or prorations necessary after close of escrow as a result of supplemental tax bills issued by the tax assessor.

**21. PRELIMINARY CHANGE OF OWNERSHIP REPORT:** California Revenue and Taxation Code Section 480.3 requires that a Preliminary Change of Ownership Report be completed and certified by the transferee and filed concurrently with the recording of any document that reflects a change of ownership in real property. The Parties herein agree to complete and sign said report and deliver same to Escrow Holder for filing, as necessary. The Parties understands and acknowledges that the recorder's office may charge a non-refundable fee of twenty dollars ($20.00) should the fully completed/certified report not accompany the conveyance document. If the recorder's office charges such a fee, the Party benefitted by the recording of the transfer document shall be charged the fee at close of escrow. In such event, a Standard Change of Ownership Statement will be mailed to the transferee by the office of the county assessor. Further, if Buyer fails to file said form upon the request of the county assessor after the close of escrow, severe penalties may be assessed against the Buyer.

**22. EXCHANGE TRANSACTIONS:** In any escrow transaction wherein one or more of the Parties is performing a 1031 Exchange transaction, all references to Seller and Buyer shall respectively be amended to read Exchangor and Exchangee, where necessary and appropriate.

**23. PROPRIETARY INFORMATION:** Escrow Holder is relieved of any duty, responsibility, and/or liability relative to disclosure of the proprietary information of the Parties and/or agents to this or any other escrow transaction. Such propriety information includes, but is not limited to, any (A) sale, resale, loan, exchange, or other transaction involving the real property and/or personal property that is the subject of this escrow transaction or (B) benefit, including but not limited to financial gain or profit, involving the real property and/or personal property that is the subject of this escrow transaction. Escrow Holder shall be relived of any and all liability if such proprietary information is disclosed as necessary for Escrow Holder to comply with the instructions of the Parties or if requested by a lender, agent, governmental agency, or any other entity entitled to such propriety information. Escrow Holder is specifically authorized to furnish copies of all escrow instructions, amendments thereto, preliminary title reports, closing statements and/or related documentation to the agents

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

Date: March 6, 2019 Escrow No.: 104427-AA



and/or attorneys representing any party to this escrow transaction, as may be requested by them, without obtaining any further authorization from Buyer or Seller.

**24. NOTIFICATION OF DISHONORED CHECKS:** If any check submitted to Escrow Holder is dishonored upon presentment for payment, Escrow Holder is authorized to notify all Parties and/or their respective agents of such nonpayment. The Party receiving credit for the deposit agrees to pay a reasonable fee to Escrow Holder for the returned check.

**25. ACCEPTANCE AND VERACITY OF SIGNATURES:** Escrow Holder shall not be responsible or liable in any manner for the sufficiency or correctness as to form, manner of execution, or validity of any document deposited with Escrow Holder relative to the identity, authority, or rights of any person executing the same. All signatures submitted into this escrow transaction shall be construed as unconditional approval of the within document as to form, content, terms, and conditions. Escrow Holder shall have no obligation to verify, and will not verify, the authenticity of any signature on any document made relative to this escrow transaction. Escrow Holder shall not be liable or responsible for any loss that may occur because of forgeries, fraud, or false representations made or involving the Parties to this escrow transaction, any third Parties, the agents or any other person or entity.

**26. ACCEPTABILITY OF COUNTERPARTS:** These instructions may be executed in counterparts, each of which shall be deemed an original regardless of the date of its execution and delivery. All such counterparts together shall constitute one and same document.

**27. STANDARDIZED FORMS:** Escrow Holder is to use Escrow Holder's usual document forms or the usual forms of any reliable forms company or any title company and in the instructions insert dates and terms on the instruments if incomplete when executed. Excepting Escrow Holder's own form, Escrow Holder shall not be liable for the correctness or sufficiency of such standardized preprinted forms.

**28. NEW FINANCING:** Escrow Holder is not to be responsible or concerned with the terms of any new financing obtained by Buyer or the contents of any loan documents. Escrow shall have no liability or responsibility relative to the new financing except to order transmission of loan documents to Escrow Holder, transmit the loan documents to the appropriate Parties for execution, and transmit the executed loan documents to the lender. The Parties understand and agree that Escrow Holder is not involved or concerned with the approval or processing of any loan or the contents and effect of any loan documents prepared by a lender. Escrow Holder is not responsible for any lender's instructions which require Escrow Holder to perform obligation or duties beyond those required by law or which requires Escrow Holder to assume liability for the lender's regulatory duties and responsibilities. Further, Escrow Holder shall have no obligation to agree to instructions from a lender which threaten to transfer liability or penalize Escrow Holder.

**29. MASTER/DUAL CLOSING STATEMENT:** The Parties are hereby made aware that certain lenders may require a copy of the Master/Dual Closing Statement, Seller Closing Disclosure and/or records showing all deposits and disbursements occurring as part of this escrow transaction. Escrow Holder is hereby authorized and instructed by the Parties to release the Master/Dual Closing Statement and other lender requested document as required. Said information may be disclosed to the Buyer as part of the Buyer's Closing Disclosure by the lender.

**30. RESPA GUIDELINES:** The undersigned Parties acknowledge that in order for Escrow Holder to comply with the Real Estate Settlement Procedures Act ("RESPA") some of the costs and charges may need to be itemized on the lending disclosures in a fashion that differs from the terms agreed to by the parties. Said costs and charges may include, but are not limited to, the title policy fees and documentary transfer taxes. Escrow Holder is hereby authorized and instructed to comply with these RESPA guidelines, as necessary. Said charges and credits shall not change the amount of any other

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________

David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________

Petros Zargaryan

______________________________

Kristine Shmavonyan

credits between the Parties.

31. **PROPERTY INSURANCE:** Excluding transactions whereby the subject property is a parcel of vacant land, Buyer is made aware that, prior to close of escrow, property insurance coverage should be obtained with sufficient liability and replacement cost. If the Buyer is obtaining new financing insurance coverage will be a condition of the loan prior to funding. Buyer shall deposit sufficient funds to pay for the first year's premium per invoice submitted by insurance agent. In the event subject property is covered by a blanket master policy of insurance, Escrow Holder is to order a certificate thereof for the Buyer and order loss payable endorsements for beneficiaries of trust deeds being recorded herein. Should Buyer desire fire insurance on personal property, they are to obtain same outside of escrow. If Buyer is purchasing the subject property as an all cash transaction, without financing, Escrow Holder shall have no responsibility whatsoever to order a certificate of insurance.

32. **ASSIGNMENT OF PROPERTY INSURANCE:** Seller represents and warrants, and Escrow Holder shall be fully protected in assuming that, as to any property insurance policy handed to Escrow Holder, such policy is in force, has not be hypothecated, and that all necessary premiums therefore have been paid. Escrow Holder will transmit for assignment, any insurance policy handed Escrow for use in this escrow transaction, but Escrow Holder shall not be responsible for verifying the acceptance of the assignment and policy by the insurance company. ESCROW HOLDER WILL MAKE NO ATTEMPT TO VERIFY THE RECEIPT OF THE REQUEST FOR ASSIGNMENT BY THE ISSUING COMPANY. The Buyer is hereby placed on notice that if the insurance company should fail to receive said assignment, the issuing company may deny coverage for any loss suffered by Buyer. IT IS THE OBLIGATION OF THE BUYER OR HIS REPRESENTATIVE TO VERIFY THE ACCEPTANCE OF THE ASSIGNMENT OF THE POLICY BY THE ISSUING COMPANY.

33. **TITLE INSURANCE:** Escrow Holder shall order title insurance from the title company designated by the Parties. If requested in writing by the mutual instructions of the Parties or upon the request of any lender, Escrow Holder shall provide copies of the preliminary report of title to them without liability as to its contents. The Parties acknowledge that the title insurance policies to be issued by the title company shall be delivered directly from the designated title company to the appropriate Parties after the close of escrow. The Parties agree that matters regarding that title insurance are between the title company and the insured Party and not Escrow Holder.

34. **AUTHORIZATION TO USE SUB-ESCROW AGENT:** Escrow Holder is authorized to use the title company as a sub-escrow agent for the handling of funds and documents in this escrow transaction. Escrow Holder is to comply with all sub-escrow agent's instructions and requirements, and Escrow Holder is authorized to deliver funds or documents to said sub-escrow agent at any time during the course of this escrow transaction as Escrow Holder deems appropriate. The Parties agree to pay the fee for such sub-escrow service as charged by the title company.

35. **BENEFICIARY DEMANDS AND STATEMENTS:** From funds due, Escrow Holder is authorized to pay at the close of escrow, any encumbrances of record, plus accrued interest, charges and bonus if any, and/or pay any delinquent monthly installments(s) on existing encumbrance(s) as disclosed by a beneficiary demand or statement without additional approval. Should a Party wish to pre approve any such beneficiary demand or statement, the Party shall deliver separate and specific written instruction to Escrow Holder prior to the close of escrow. Escrow Holder is not responsible for the contents or accuracy of any beneficiary demand or statement delivered to Escrow Holder by the beneficiary. The Parties are aware that payoffs of encumbrances are done by the insuring title company, not Escrow Holder, and agree to seek any redress directly from the beneficiary and/or title company should a dispute arise regarding said payoff. The Parties are aware some lenders require payment of loans to offices outside of the area and/or outside of the state. The Parties are advised that interest will continue to accrue on any outstanding loans until the loan is paid in full, regardless of the date of close of escrow. The title company may charge messenger fees, wire fees, and/or overnight fees, which the

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________

David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________

Petros Zargaryan

______________________________

Kristine Shmavonyan

benefitted Party agrees to pay at close of escrow.

36. **LINE OF CREDIT PAYOFF INDEMNIFICATION AND CANCELLATION:** The undersigned Parties hereby indemnify and hold the title company and Escrow Holder harmless from incurring any costs or additional charges, interest, and advances made but not disclosed on the beneficiary demand or statement provided for the payoff of that certain equity line of credit deed of trust (hereinafter "line of credit") shown on preliminary title report, if any. The Parties warrant and represent that instructions to the beneficiary have been made to freeze the line of credit, that no advance on the line of credit has been made since the opening of this escrow transaction, and that no advance will be made on the line of credit prior to close of escrow. In the event, after receipt of payoff, the beneficiary makes demand for additional funds, the undersigned Parties agree to deposit those funds immediately with the title company or Escrow Company and authorizes the title company to utilize those funds to effectuate the close of the line of credit. Upon payoff of the line of credit, Escrow Holder is hereby instructed to request that the beneficiary cancel said line of credit.

37. **PRORATIONS AND ADJUSTMENTS:** Escrow Holder is instructed to make all prorations and adjustments on the basis of a thirty (30) day month. Escrow Holder is to use information contained on latest available tax statement, rental statement, beneficiary 's statement, insurance statement, or other statement as delivered to Escrow Holder for the prorations provided for herein.

38. **RECORDING OF DOCUMENTS:** The Parties authorize the recordation of any instrument delivered through this escrow transaction if necessary or proper for the issuance of the required policies of title insurance or as necessary for close of escrow. Recording fees shall be charged to the account of the benefited Party unless instructed otherwise by the Parties in writing.

39. **DELIVERY OF DEED:** Regardless of the date of execution or transmission to Escrow Holder of the deed, same shall be deemed delivered ONLY upon recordation through this escrow transaction. The phrase "close of escrow" as used in this escrow transaction shall mean the date on which documents are recorded, unless otherwise specified.

40. **ASSIGNMENT OF FUNDS:** If a Party unilaterally assigns or orders the proceeds of this escrow transaction to be paid to other than the original parties to this escrow, such assignment or order shall be subordinate to the expenses of this escrow transaction, liens of record on the subject property, and payments directed to be made by Parties to this escrow transaction. If the result of such assignment or order would leave the escrow without sufficient funds to close, then Escrow Holder is directed to close nevertheless and pay such assignments or orders only out of the net proceeds due the Party assigning their funds except for such assignments or orders, and to pay them in the order in which such assignments or orders are received by Escrow Holder. Escrow Holder is not to be concerned with the balance remaining unpaid, if any.

41. **DISBURSEMENT OF FUNDS AND DELIVERY OF DOCUMENTS:** All disbursements are to be made by the Escrow Holder's trust account check unless instructed otherwise in writing. Escrow Holder will not indemnify any payee or guarantee signatures of any person or entity at any financial institution. Generally, Escrow Holder or its sub-escrow agent will disburse funds, including net proceeds and payment for encumbrances of record, on the date the escrow closes; however, there are circumstances which may arise wherein said disbursements could be delayed by one or two business days. Any funds disbursed during or at the close of escrow will be issued jointly to the Parties designated as payee unless Escrow Holder is instructed otherwise in writing by all designated payees. The funds representing loan and/or sale proceeds will be disbursed jointly to all persons who were the record owners of the subject property. All disbursements of funds and/or delivery of other documents or instruments concerning this escrow transaction will be mailed to the entitled Party by regular first class mail, postage prepaid, at the last address provided to Escrow Holder. However, at Escrow Holder's discretion, Escrow Holder may send funds and/or other documents by certified or registered mail, overnight

| **SELLERS:** | **BUYERS:** |
|---|---|
| Bankruptcy Estate of Alliance Funding Group, Inc. | ______________________ Petros Zargaryan |
| By: ______________________ David Seror, solely in his capacity as Chapter 7 Trustee | ______________________ Kristine Shmavonyan |

Date: March 6, 2019 Escrow No.: 104427-AA



delivery, or messenger, in which case the Party for whom the delivery was made agrees to pay the costs.

42. **CONTRACTED RATE:** Escrow Holder may provide a contracted rate to customers who have completed one or more escrows with Escrow Holder within the last two (2) years. Said discount will be provided solely to the contracted customer irrespective of the agreement of the Parties relative to the division of escrow fees.

43. **SEVERABILITY:** In the event any escrow instruction or supplemental instruction in this escrow transaction, including these general provisions, is held invalid by judicial proceedings, the remaining shall continue to be operative and enforceable.

44. **CONFLICTING INSTRUCTIONS:** If conflicting demands or notices are made or served upon Escrow Holder or any controversy arises between the Parties or with any third person arising out of or relating to this escrow transaction, Escrow Holder shall have the absolute right to withhold and stop all further proceedings in, and in performance of, this escrow transaction until Escrow Holder receives written notification satisfactory to Escrow Holder of the settlement of the controversy by written agreement of the Parties, or by the final order or judgment of a court of competent jurisdiction.

45. **MUTUAL CANCELLATION INSTRUCTION REQUIREMENTS:** The Parties acknowledge that they are on notice that Escrow Holder shall exercise its discretion to require mutual or matching cancellation instructions instructing Escrow Holder on how the deposit is to be released, signed by all Parties and deposited with Escrow Holder prior to releasing any deposit held by Escrow Holder relative to this escrow transaction.

46. **CANCELLATION FEES:** In the event of cancellation or any other termination of this escrow transaction, the Parties agree to pay Escrow Holder for any costs or expenses which Escrow Holder may have incurred or become obligated for pursuant to this escrow transaction and a reasonable escrow fee for the services performed to date. Such costs and expenses, if any, and Escrow Holder's fee shall be deposited with Escrow Holder before any cancellation or other termination is effective. The Parties agree that said charges for costs, expenses and fees may be apportioned between the Parties in a manner which Escrow Holder, in Escrow Holder's sole discretion, considers equitable, and that Escrow Holder's decision in that regard will be binding and conclusive upon the Parties unless specifically agreed to or determined by a court of competent jurisdiction. In the event of failure to pay costs, expenses, and fees due hereunder, on demand, the Parties agree to pay reasonable fees for any attorney services which may be required to collect such fees or expenses. Upon payment of such cancellation fees, Escrow Holder is authorized to return documents and funds to the respective Parties depositing same, or for whose benefit an unconditional deposit was made; or to void executed instruments as appropriate.

47. **TIME IS OF THE ESSENCE:** Time is of the essence in these instructions. In the event that the conditions of this escrow transaction have not been complied with at the expiration of the time provided for herein, or any extension thereof, Escrow Holder is instructed to complete the same at the earliest possible date thereafter, unless written demand upon Escrow Holder to cancel this Escrow or for the return of the money and/or instruments is deposited by one or more Parties. If the date by which the parties' performances are due shall be other than Escrow Holder's regular business day, such performances shall be due on Escrow Holder's next succeeding business day.

48. **ABANDONMENT OF ESCROW TRANSACTION:** Escrow Holder duties and functions related to this escrow transaction shall terminate six (6) months following the date last set for close of escrow unless the escrow transaction has closed or cancelled. At such time, Escrow Holder shall have no further obligations as Escrow Holder except to disburse funds and documents pursuant to written instructions and to interplead or otherwise dispose of funds and documents in accordance with a validly issued and validly served order from a court of competent jurisdiction.

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

Date: March 6, 2019 Escrow No.: 104427-AA

Page 12 of 13: Additional instructions made a part of previous pages as fully incorporated therein.

**49. UNCASHED CHECKS:** In the event any check(s) issued through this escrow transaction or sub-escrow related hereto are uncashed or unnegotiated ("uncashed") Escrow Holder will make every effort to contact the payee and coordinate negotiation of the check(s). The Parties acknowledge that Escrow Holder incurs significant expense in tracking uncashed checks, canceling and reissuing checks, and maintaining bank and accounting records of such checks. Therefore, if re-issuance of the check is necessitated, Escrow Holder will require an instruction authorizing such re-issuance and is authorized to charge an additional services fee of twenty-five dollars ($25.00) which will be deducted from the payee's reissued check(s).

**50. ESCHEATMENT:** Any and all funds remaining in escrow three (3) years after the close of escrow or cancellation of this escrow transaction will be escheated to the State of California pursuant to the Unclaimed Property Law codified in California Code of Civil Procedure Section 1518.

**51. AUTHORIZATION TO INTERPLEAD FUNDS:** The Parties acknowledge that Escrow Holder has an absolute legal right to file a court action in interpleader. In the event such an action is filed, the Parties herein jointly and severally agree to pay all escrow fees, title fees, court costs, and litigation expenses, including attorney's fees, incurred in connection therewith, the amount thereof to be fixed and judgment to be reached by the court. Upon filing of such action, Escrow Holder is fully released and discharged from any further performance of duties under the terms of this Escrow.

**52. RIGHT TO RESIGN:** At any time prior to the close of escrow, Escrow Holder, at its sole and absolute discretion and without liability to the Parties to this escrow transaction, may withdraw and resign from acting as Escrow Holder by providing ten (10) days prior written notice to the Parties at their last known addresses. In such event, Escrow Holder shall be entitled to reasonable compensation for its escrow services performed and for all costs and expenses incurred in the resignation, including, but not limited to, attorney's fees. Upon resignation, Escrow Holder shall return to the Parties who deposited the same, the balance of any funds it holds, along with any property or documents in its possession. Alternatively, at the mutual instruction of the Parties, Escrow Holder shall deliver the funds, property, and documents to a new Escrow Holder.

**53. DESTRUCTION OF DOCUMENTS:** Escrow Holder is authorized to destroy or otherwise dispose of any and all documents, papers, escrow instructions, correspondence, records or other material pertaining to this escrow, at any time after five (5) years from the date of close of escrow, cancellation of this transaction, or the date of the last activity (whichever comes first), without liability and without further notice to the Parties.

**54. PRIVACY NOTICE:** This notification is in compliance with our obligations to comply with federal and state law to safeguard the Parties' non-public personal information. Escrow Holder collects non-public personal information about the Parties from the following sources; a) Information Escrow Holder receives from the Parties on applications or other forms; b) Information about the Parties' transactions with Escrow Holder, Escrow Holder's affiliates, or others involved in the processing of the transaction; and c) Information Escrow Holder receives from a consumer reporting agency. Escrow Holder does not disclose any non-public personal information about customers or former customers to anyone, except as permitted by law. Escrow Holder restricts access to non-public information about the Parties to those employees who need to know that information to provide products or services to the Parties. Escrow Holder maintains physical, electronic and procedural safeguards that comply with federal and state regulations to guard the Parties' non-public personal information. By signing below, the undersigned Parties acknowledge that they have read and received a copy of this notification.

**55. PROHIBITION UPON GIVING LEGAL OR FINANCIAL ADVICE:** The Parties acknowledge and understand that Escrow Holder is not authorized to practice the law nor does Escrow Holder give financial advice. The Parties are advised to seek legal and financial counsel and advice concerning the effect of this escrow transaction. The Parties

| SELLERS: | BUYERS: |
|---|---|
| Bankruptcy Estate of Alliance Funding Group, Inc. | [signature] Petros Zargaryan |
| By: ______ David Seror, solely in his capacity as Chapter 7 Trustee | [signature] Kristine Shmavonyan |

Date: March 6, 2019 Escrow No.: 104427-AA

Page 13 of 13: Additional instructions made a part of previous pages as fully incorporated therein.

acknowledge that no representations have been made by Escrow Holder about the legal sufficiency, legal consequences, financial effects, or tax consequences of the within escrow transaction.

ESCROW COMPANIES ARE NOT AUTHORIZED TO GIVE LEGAL ADVICE. IF YOU DESIRE LEGAL ADVICE, CONSULT YOUR ATTORNEY BEFORE SIGNING.

EACH PARTY SIGNING THESE INSTRUCTIONS HAS READ THE ADDITIONAL ESCROW CONDITIONS AND INSTRUCTIONS CONTAINED HEREIN AND APPROVES, ACCEPTS AND AGREES TO BE BOUND THEREBY. ALL PARTIES SIGNING THIS AGREEMENT HEREBY ACKNOWLEDGE RECEIPT OF A COPY OF THESE INSTRUCTIONS.

I/We agree to pay FUNDS REQUIRED TO CLOSE ESCROW UPON DEMAND.

SELLER(S) ONLY: The foregoing terms, provisions, conditions, and instructions, and those "General Provisions" contained herein are hereby approved and accepted in their entirety and concurred in by me. I will hand you necessary documents called for on my part to cause title to be shown as above which you are authorized to deliver when you hold or have caused to be applied funds as set forth herein above within the time as above provided. Pay your escrow charges, my recording fees, charges for evidence of title as called for, and any other customary chargeable fees to Seller, whether or not this escrow is consummated, except those Buyer agreed to pay. You are hereby authorized to pay bonds, assessments, taxes, and any liens of record including prepayment penalties, if any, to show title as called for. Affix and pay Documentary Transfer Tax on deed as required.

**SELLERS:**

Bankruptcy Estate of Alliance Funding Group, Inc.

By: ______________________________
David Seror, solely in his capacity as Chapter 7 Trustee

**BUYERS:**

______________________________
Petros Zargaryan

______________________________
Kristine Shmavonyan

# EXHIBIT "B"

Case 1:17-bk-11888-MT Doc 17 Filed 11/15/17 Entered 11/15/17 16:42:26 Desc
Main Document Page 7 of 117

THE FUENTES LAW FIRM SBN # 263823
RUBEN FUENTES
4524 WHITTIER BLVD.
LOS ANGELES, CA 90022
TELEPHONE: (323)262-1040
FACSIMILE (323) 262-1091

rubencpa@AOL.COM

Attorney for Debtor

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | **CASE NO.: 1:17-bk-11888-MT** |
| ALLIANCE FUNDING GROUP, INC., | CHAPTER 7 |
| Debtor | DECLARATION OF FIROOZ PAYAN, DEBTOR'S CEO AND RUBEN FUENTES DEBTOR'S COUNSEL, IN SUPPORT OF MOTION TO CONVERT THE CURRENT CASE TO CHAPTER 11 CASE. |

## DECLARATION OF FIROOZ PAYAN

I, Firooz Payan, declare as follows:

**I. GENERAL BACKGROUND:**

1. I am the CEO and President of Alliance Funding Corp., the Debtor herein. I am also the sole shareholder of the Debtor.

2. The Debtor is engaged in the business of lending funds to people who has a low FICO score and / or construction loans. The loans given by Debtor are usually with a collateral in real estate.

3. Some of loans that Debtor made previously went into default and in the regular course of business, Debtor has to pursue to collection of those loans including but not limited to foreclose upon the collateral received from the borrowers.

4. In the regular course of business, on or about April 01 of 2014 , Debtor loaned a HELOC open account type of loan for the total sum of $ 350,000.00, (the "Alliance Loan") to Hamlet Betsarghez ("Hamlet").

5. The Alliance loan was executed with a Note and accompanying Deed of Trust and secured by the real property locate at 1020 E. Providencia Ave. Burbank, CA 91501 (the "Subject Property"). True and correct copies of the Deed of Trust and Note are attached hereto collectively as **Exhibit "1" .**

6. Since the inception of the Alliance Loan. Hamlet acted in bad faith as he did not make any single payment whatsoever and also about two months and a half after getting the Alliance's Loan Hamlet transferred the Subject Property to Mkrtchyan Investments, LP as a "gift". (**Exhibit "2"**)

7. Hamlet also colluded with the holder of the loan from Allen Melikian, also securing the Subject Property, in the amount of $306,000.00 (the "Melikian Note"). Even though the amount due for the Melikian Note in 2013 was only $306,000, Melikian sought to foreclose for the amount of $616,064.46 in January 2017 ( see Notice of Default, **Exhibit "3"** ) and later for the alleged amount of $1,164,658.73 in May of 2017 ( see Trustee Sale, **Exhibit "4"** ) without any legal basis or justification.

8. Based on the default of Hamlet in the Alliance Loan, Debtor initiated the foreclosure process of the Alliance Loan. This foreclosure process was started on March of 2017 ( See Notice of Default **Exhibit "5"** ) almost concurrently with the foreclosure

process TD Foreclosure Services, Inc. had initiated earlier in January 2017 on the Melikian Note. **Exhibit "3"**

9. In reviewing the amount of the first Deed of trust, the Melikian Note, it became clear that there had been many machination by Hamlet, the original owner of the Subject Property, the most glaring of which is that he had transferred the property to a third party (**Exhibit "2"**), who then borrowed funds secured by deeds of trust JUNIOR to that held by the Debtor, including a Deed of Trust for $ 850,000 in September of 2015 (**Exhibit "6"**); another Deed of Trust for $ 150,000 in December of 2015 (**Exhibit "7"**); and another Deed of Trust for $250,000 in May of 2016 (**Exhibit "8"**);

10. Further. on June 05, 2017 the title of the Subject Property was transferred again as a gift to Arthur Nagapetyan (**Exhibit "9"**) clouding the marketability of the title of the Subject Property even more.

11. The Melikian Note is now including these later advances as part of the first; in essence, these junior lien holders were jumping over the Debtor's interest through the guise of a senior lienholder foreclosure. Thus currently the issue was going to be a determination of the nature, amount and extent of the priority interest in the Subject Property through a "Quiet Title" action .

12. Even though TD Foreclosure Services, Inc. (TD), the trustee in charge of the foreclosure sale for the Melikian Note, was duly informed of the filing of this case, they still did not postpone the sale of the Subject Property and even threatened to foreclose regardless; Debtor's attorney was required to issue a warning to TD Foreclosure Services (attached hereto as **Exhibit "10"**) to get them to refrain from harassing Debtor and to postpone the sale of the Subject Property. Eventually TD did.

13. Later in October 31 of 2017, TD intended to foreclose again the Subject Property and scheduled again the foreclosure sale and Debtor's real estate attorney Scott Brown had to issue another warning (attached hereto as **Exhibit "11"**) to postpone again the foreclosure sale; however, TD never replied and Debtor again was in jeopardy of losing all of its rights on the Alliance Loan. It is important to point out that TD is a corporation that is suspended and not able to operate in California while suspended **(Exhibit "12")** and apparently quite willing to move forward with the foreclosure sale in spite of the automatic stay, of which it had more than proper notice.

14. Debtor has been in the predicament that if Debtor does not foreclose first the Subject Property, Debtor would lose all of its rights on the Alliance Loan or would have to litigate a wrongful foreclosure sale and both Debtor's creditors and the bankruptcy estate would be affected significantly if he did not act and proceeded in the good faith belief that it was acting in the regular course of business to foreclose on the Subject Property.

15. The duly noticed sale of the Subject Property was held on November 06, 2017 and the Debtor credit bid a part of the Alliance Loan and was the only and therefore successful bidder. The Trustee Deed was recorded on November 14, 2017, a true and correct copy is attached and labeled as **Exhibit "13".**

## II. DEBTOR MEETS THE FINANCIAL REQUIREMENT AND GOOD FAITH TO CONVERT TO CHAPTER 11 :

16. At this point, the Debtor wishes to convert the case to one under chapter 11. That way, it can proceed to a quiet title action. This is a state law matter that can be addressed by the Debtor by filing a quiet title action.

17. I am aware that the Debtor has reporting and approval requirements in a chapter 11, and I am prepared to assume those obligations. In addition, the Subject Property has a tenant, which generates rent, and I understand that there are monthly reports and other reporting requirements for funds in the estate.

18. I also understand that the Debtor must keep taxes and insurance current and I am prepared to loan the Debtor sufficient funds to meet these obligations or from an increase in the equity of the Debtor with the court prior permission.

19. The chapter 11 will be also feasible from the rent that the Subject Property is generating or can generate and be able to meet the current debt obligations and also operational expenses.

20. Should the Court not believe that conversion is appropriate, the Debtor can resolve both the quiet title action and its creditors in state court instead of this Court. If the Court believes conversion is not appropriate since the Debtor is now solvent and is no longer at risk of being wiped out by an inappropriate foreclosure, the Debtor would ask this Court to dismiss this case and discharge the trustee.

21. I, as the Debtor's sole shareholder and creditor and the additional creditor Robert Askar, support conversion or dismissal of this case.

22. There is no other listed creditor by Debtor. There is only one Proof of Claim filed by Siafa Vani, which is on its face defective as the alleged claim is against the shareholder of the Debtor and not the Debtor itself; therefore, it can be resolved fairly fast in state court rather that this court.

23. Debtor has not converted this case before and has complied with all the requirements and acted in good faith in this case.

24. I understand the Trustee may have some Trustee's administrative fees or there may be US Trustee fees that need to be paid a condition to dismissal of this case. The Debtor will of course pay the statutory fees that are due the Trustee and the UST as condition of dismissal or conversion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. If called as a witness, I would and could testify competently thereto. Executed this 14th day of November 2017 at Los Angeles, California.

Firooz Payan,
CEO of Alliance Funding Group, Inc.





Scanned by CamScanner 

# EXHIBIT "C"

CALIFORNIA ASSOCIATION OF REALTORS®

# RESIDENTIAL LISTING AGREEMENT
**(Exclusive Authorization and Right to Sell)**
**(C.A.R. Form RLA, Revised 12/18)**

COLDWELL BANKER RESIDENTIAL BROKERAGE

**Date Prepared:** *02/13/2019*

1. **EXCLUSIVE RIGHT TO SELL:** *David Seror, Chapter 7 Trustee* ("Seller") hereby employs and grants *Coldwell Banker Residental Brokerage* ("Broker") beginning (date) *February 13, 2019* and ending at 11:59 P.M. on (date) *August 13, 2019* ("Listing Period") the exclusive and irrevocable right to sell or exchange the real property described as *1020 E Providencia Ave* , situated in *Burbank* (City), *Los Angeles* (County), California, *91501-1545* (Zip Code), Assessor's Parcel No. *5620-003-029* ("Property").
   - ☐ This Property is a manufactured (mobile) home. See addendum for additional terms.
   - ☐ This Property is being sold as part of a probate, conservatorship or guardianship. See addendum for additional terms.
2. **LISTING PRICE AND TERMS:**
   A. The listing price shall be: *One Million, Two Hundred Ninety-Five Thousand* Dollars ($ *1,295,000.00* ).
   B. Listing Terms: *Subject to U.S. Bankruptcy Court Approval and overbid. Addendum attached.*
3. **COMPENSATION TO BROKER:**
   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Seller and Broker (real estate commissions include all compensation and fees to Broker).**
   A. Seller agrees to pay to Broker as compensation for services irrespective of agency relationship(s), either ☒ *6.000* percent of the listing price (or if a purchase agreement is entered into, of the purchase price), or ☐ $ ________, AND ________, as follows:
   (1) If during the Listing Period, or any extension, Broker, cooperating broker, Seller or any other person procures a ready, willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the Buyer completes the transaction or is prevented from doing so by Seller. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)
   **OR (2)** If within ________ calendar days (a) after the end of the Listing Period or any extension; or (b) after any cancellation of this Agreement, unless otherwise agreed, Seller enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ("Prospective Buyer") or that person's related entity: (i) who physically entered and was shown the Property during the Listing Period or any extension by Broker or a cooperating broker; or (ii) for whom Broker or any cooperating broker submitted to Seller a signed, written offer to acquire, lease, exchange or obtain an option on the Property. Seller, however, shall have no obligation to Broker under paragraph 3A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given Seller a written notice of the names of such Prospective Buyers.
   **OR (3)** If, without Broker's prior written consent, the Property is withdrawn from sale, conveyed, leased, rented, otherwise transferred, or made unmarketable by a voluntary act of Seller during the Listing Period, or any extension.
   B. If completion of the sale is prevented by a party to the transaction other than Seller, then compensation which otherwise would have been earned under paragraph 3A shall be payable only if and when Seller collects damages by suit, arbitration, settlement or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.
   C. In addition, Seller agrees to pay Broker: ________.
   D. Seller has been advised of Broker's policy regarding cooperation with, and the amount of compensation offered to, other brokers.
   (1) Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ("MLS") by offering to MLS brokers out of Broker's compensation specified in 3A, either ☒ *3.000* percent of the purchase price, or ☐ $ ________.
   (2) Broker is authorized to cooperate with and compensate brokers operating outside the MLS as per Broker's policy.
   E. Seller hereby irrevocably assigns to Broker the above compensation from Seller's funds and proceeds in escrow. Broker may submit this Agreement, as instructions to compensate Broker pursuant to paragraph 3A, to any escrow regarding the Property involving Seller and a buyer, Prospective Buyer or other transferee.
   ~~F. (1) Seller represents that Seller has not previously entered into a listing agreement with another broker regarding the Property, unless specified as follows: (2) Seller warrants that Seller has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the following individuals or entities: (3) If the Property is sold to anyone listed above during the time Seller is obligated to compensate another broker: (i) Broker is not entitled to compensation under this Agreement; and (ii) Broker is not obligated to represent Seller in such transaction.~~

© 2018, California Association of REALTORS®, Inc.



Seller's Initials ( [initials] ) ( ________ )

Property Address: *1020 E Providencia Ave, Burbank, CA 91501-1545* Date: *02/13/2019*

4. A. **ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in a real estate purchase agreement, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded, from the purchase price.
**ADDITIONAL ITEMS EXCLUDED:** ____________________.
**ADDITIONAL ITEMS INCLUDED:** ____________________.
Seller intends that the above items be excluded or included in offering the Property for sale, but understands that: (i) the purchase agreement supersedes any intention expressed above and will ultimately determine which items are excluded and included in the sale; and (ii) Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the purchase agreement.

B. **(1) Leased Or Not Owned Items:** The following items are leased or not owned by Seller:
☐ Solar power system ☐ Alarm system ☐ Propane tank ☐ Water Softener
☐ Other ____________________
**(2) Liened Items:** The following items have been financed and a lien has been placed on the Property to secure payment:
☐ Solar power system ☐ Windows or doors ☐ Heating/Ventilation/Air conditioning system
☐ Other ____________________
Seller will provide to Buyer, as part of the sales agreement, copies of lease documents, or other documents obligating Seller to pay for any such leased or liened item.

5. **MULTIPLE LISTING SERVICE:**

A. Broker is a participant/subscriber to *CLAW* Multiple Listing Service (MLS) and possibly others. Unless otherwise instructed in writing the Property will be listed with the MLS(s) specified above. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. All terms of the transaction, including sales price and financing, if applicable, (i) will be provided to the MLS in which the property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS and (ii) may be provided to the MLS even if the Property was not listed with the MLS. Seller consents to Broker providing a copy of this listing agreement to the MLS if required by the MLS.

**BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS; PRESENTING ALL OFFERS**

**WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit listing information to Internet sites that post property listings online.

**EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS.

**CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** Closed or private listing clubs or groups are not the same as the MLS. The MLS referred to above is accessible to all eligible real estate licensees and provides broad exposure for a listed property. Private or closed listing clubs or groups of licensees may have been formed outside the MLS. Private or closed listing clubs or groups are accessible to a more limited number of licensees and generally offer less exposure for listed property. Whether listing property through a closed, private network - and excluding it from the MLS - is advantageous or disadvantageous to a seller, and why, should be discussed with the agent taking the Seller's listing.

**NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

**OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: (a) real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; (b) Information about Seller's Property will not be transmitted from the MLS to various real estate Internet sites that are used by the public to search for property listings; (c) real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

**PRESENTING ALL OFFERS:** Seller understands that Broker must present all offers received for Seller's Property unless Seller gives Broker written instructions to the contrary.

**Seller's Initials** ( [initials] )( ________ ) **Broker's/Agent's Initials** ( SF )( ________ )

Seller's Initials ( ________ ) ( ________ )


Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1020 E

Property Address: 1020 E Providencia Ave, Burbank, CA 91501-1545 Date: 02/13/2019

B. MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement. Broker will not have to submit this listing to the MLS if, within that time, Broker submits to the MLS an appropriate form signed by Seller.
☐ Seller elects to exclude the Property from the MLS as provided by C.A.R. Form SELM or the local equivalent form.

C. MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Seller acknowledges that for any of the below opt-out instructions to be effective, Seller must make them on a separate instruction to Broker signed by Seller. Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:
**(1) Property Availability On The MLS; Address On the MLS:** Seller can instruct Broker to have the MLS not display the Property or the Property address on the Internet. Seller understands that either of these opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.
**(2) Feature Opt-Outs:** Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below. Seller understands (i) that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; (ii) that other Internet sites may or may not have the features set forth herein; and (iii) that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.
**(a) Comments And Reviews:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display.
**(b) Automated Estimate Of Value:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display. ☐ Seller elects to opt out of certain Internet features as provided by C.A.R. Form SELI or the local equivalent form.

~~6. SELLER REPRESENTATIONS: Seller represents that, unless otherwise specified in writing, Seller is unaware of: (i) any Notice of Default recorded against the Property; (ii) any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; (iii) any bankruptcy, insolvency or similar proceeding affecting the Property; (iv) any litigation, arbitration, administrative action, government investigation or other pending or threatened action that affects or may affect the Property or Seller's ability to transfer it; and (v) any current, pending or proposed special assessments affecting the Property. Seller shall promptly notify Broker in writing if Seller becomes aware of any of these items during the Listing Period or any extension thereof.~~

7. **BROKER'S AND SELLER'S DUTIES:**

A. Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Seller gives Broker written instructions to the contrary, Broker is authorized, but not required, to (i) order reports and disclosures including those specified in 7C as necessary, (ii) advertise and market the Property by any method and in any medium selected by Broker, including MLS and the Internet, and, to the extent permitted by these media, control the dissemination of the information submitted to any medium; and (iii) disclose to any real estate licensee making an inquiry the receipt of any offers on the Property and the offering price of such offers.

B. Seller agrees to consider offers presented by Broker, and to act in good faith to accomplish the sale of the Property by, among other things, making the Property available for showing at reasonable times and, subject to paragraph 3F, referring to Broker all inquiries of any party interested in the Property. Seller is responsible for determining at what price to list and sell the Property.

C. Investigations and Reports: Seller agrees, within 5 (or___) Days of the beginning date of this Agreement, to pay for the following pre-sale reports: ☐ Structural Pest Control ☐ General Property Inspection ☐ Homeowners Association Documents ☐ Other

~~D. Seller further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments attorney fees and costs arising from any incorrect or incomplete information supplied by Seller, or from any material facts that Seller knows but fails to disclose including dangerous or hidden conditions on the Property.~~

8. **DEPOSIT**: Broker is authorized to accept and hold on Seller's behalf any deposits to be applied toward the purchase price.

9. **AGENCY RELATIONSHIPS:**

A. **Disclosure:** The Seller acknowledges receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).

B. **Seller Representation:** Broker shall represent Seller in any resulting transaction, except as specified in paragraph 3F.

C. **Possible Dual Agency With Buyer:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Seller and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Seller any election to act as a dual agent representing both Seller and Buyer. If a Buyer is procured directly by Broker or an associate-licensee in Broker's firm, Seller hereby consents to Broker acting as a dual agent for Seller and Buyer. In the event of an exchange, Seller hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Seller understands and agrees that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

Seller's Initials ( ) ( )


Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com
1020 E

Property Address: 1020 E Providencia Ave, Burbank, CA 91501-1545 Date: 02/13/2019

**D. Confirmation:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Seller's execution of a purchase agreement.

**E. Potentially Competing Sellers and Buyers:** Seller understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or purchase through Broker, property the same as or similar to Seller's Property. Seller consents to Broker's representation of sellers and buyers of other properties before, during and after the end of this Agreement. Seller acknowledges receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

**10. SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of, the interior of the Property. Seller agrees: (i) to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and (ii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Seller. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Seller (such as "nanny cams" and hidden security cameras). Seller is advised to post notice disclosing the existence of security devices.

**11. PHOTOGRAPHS AND INTERNET ADVERTISING:**

**A.** In order to effectively market the Property for sale it is often necessary to provide photographs, virtual tours and other media to buyers. Seller agrees (or ☐ if checked, does not agree) that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Property ("Images") for static and/or virtual tours of the Property by buyers and others for use on Broker's website, the MLS, and other marketing materials and sites. Seller acknowledges that once Images are placed on the Internet neither Broker nor Seller has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Seller further assigns any rights in all Images to the Broker and agrees that such Images are the property of Broker and that Broker may use such Images for advertising, including post sale and for Broker's business in the future.

**B.** Seller acknowledges that prospective buyers and/or other persons coming onto the property may take photographs, videos or other images of the property. Seller understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. (If checked ) ☐ Seller instructs Broker to publish in the MLS that taking of Images is limited to those persons preparing Appraisal or Inspection reports. Seller acknowledges that unauthorized persons may take images who do not have access to or have not read any limiting instruction in the MLS or who take images regardless of any limiting instruction in the MLS. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Seller has control over who views such Images nor what use viewers may make of the Images.

**12. KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors, and accompanied prospective buyers. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism or damage attributed to the use of a keysafe/lockbox. Seller does (or if checked ☐ does not) authorize Broker to install a keysafe/lockbox. If Seller does not occupy the Property, Seller shall be responsible for obtaining occupant(s)' written permission for use of a keysafe/lockbox (C.A.R. Form KLA).

**13. SIGN:** Seller does (or if checked ☐ does not) authorize Broker to install a FOR SALE/SOLD sign on the Property.

**14. EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

**15. ATTORNEY FEES:** In any action, proceeding or arbitration between Seller and Broker to enforce the compensation provisions of this Agreement, the prevailing Seller or Broker shall be entitled to reasonable attorney fees and costs from the non-prevailing Seller or Broker, except as provided in paragraph 19A.

**16. ADDITIONAL TERMS:** ☐ REO Advisory Listing (C.A.R. Form REOL) ☐ Short Sale Information and Advisory (C.A.R. Form SSIA)
☐ Trust Advisory (C.A.R. Form TA)
☐ Seller intends to include a contingency to purchase a replacement property as part of any resulting transaction

**17. MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Agreement, in writing, within **5 Days** After its execution.

**18. SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon Seller and Seller's successors and assigns.

**19. DISPUTE RESOLUTION:**

**A. MEDIATION:** Seller and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. Exclusions from this mediation agreement are specified in paragraph 19B.

Seller's Initials ( ) ( )



Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1020 E

Property Address: *1020 E Providencia Ave, Burbank, CA 91501-1545* Date: *02/13/2019*

~~B. ADDITIONAL MEDIATION TERMS: The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.~~

~~C. ADVISORY: If Seller and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).~~

20. **ENTIRE AGREEMENT:** All prior discussions, negotiations and agreements between the parties concerning the subject matter of this Agreement are superseded by this Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Agreement and any supplement, addendum or modification, including any photocopy or facsimile, may be executed in counterparts.

21. **OWNERSHIP, TITLE AND AUTHORITY:** Seller warrants that: (i) Seller is the owner of the Property; (ii) no other persons or entities have title to the Property; and (iii) Seller has the authority to both execute this Agreement and sell the Property. Exceptions to ownership, title and authority are as follows: ______

☐ REPRESENTATIVE CAPACITY: This Listing Agreement is being signed for Seller by an individual acting in a Representative Capacity as specified in the attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. Seller (i) represents that the entity for which the individual is signing already exists and (ii) shall Deliver to Broker, within 3 Days After Execution of this Agreement, evidence of authority to act (such as but not limited to: applicable trust document, or portion thereof, letters testamentary, court order, power of attorney, resolution, or formation documents of the business entity).

**By signing below, Seller acknowledges that Seller has read, understands, received a copy of and agrees to the terms of this Agreement.**

Seller [signature] *David Seror, Chapter 7 Trustee* Date 2/20/19
*David Seror, Chapter 7 Trustee*
Address ______ City ______ State ______ Zip ______
Telephone ______ Fax ______ E-mail ______

Seller ______ Date ______
Address ______ City ______ State ______ Zip ______
Telephone ______ Fax ______ E-mail ______

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

Real Estate Broker (Firm) *Coldwell Banker Residental Brokerage* DRE Lic. # *00616212*
Address *9229 Sunset Blvd, Ste 320* City *West Hollywood* State *CA* Zip *90069*
By *Steve Flores* [signature] Tel. *(323)210-1422* E-mail *stvfl@hotmail.com* DRE Lic.# *01272369* 00980877 Date 02/13/2019 09:36 PM GMT
*Steve Flores/Jane Schore*
By [signature] Tel. *(310)586-0367* E-mail *billfried@earthlink.net* DRE Lic.# *00672015* Date 2-13-19
*Bill Friedman*

☐ Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 1991-2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**ADDENDUM TO EXCLUSIVE AUTHORIZATION AND RIGHT TO SALE**

David Seror, solely in the capacity as the Chapter 7 Trustee ("Trustee") of the bankruptcy estate of Alliance Funding Group, Inc ("Debtor") in the Debtor's bankruptcy case in the United States Bankruptcy Court for the Central District of California, agrees to grant Coldwell Banker("Broker") the exclusive right to negotiate a sale of the real property commonly described as 1020 Providencia Ave, Burbank, California("Property") upon the terms and conditions of the Exclusive Authorization and Right to Sell Property ("Exclusive Authorization"), as amended by the following terms and conditions:

1. Addendum. This Addendum applies to the Exclusive Authorization. Notwithstanding any contrary terms and conditions in the Exclusive Authorization, this Addendum shall apply.

2. No Liability. The Trustee is listing the Property for sale with the Broker in the capacity as Trustee and not in the Trustee's personal capacity, and no liability or obligations shall accrue to the Trustee personally as a result of such listing.

3. Termination. The Trustee may terminate the Exclusive Authorization at the Trustee's option and upon written notice to the Broker at any time, and no liability or obligations shall accrue to the estate or to the Trustee, either personally or in the capacity as Trustee, as a result of any such termination.

4. Abandonment. The Trustee reserves the right, in the Trustee's sole discretion, to determine not to sell the Property and to abandon the Property by serving a notice of the Trustee's intention to abandon the Property upon the Debtor, the Debtor's counsel, the United States Trustee, all creditors, and all parties in interest. In the event of any such abandonment, the Exclusive Authorization and this Addendum shall terminate and no liability or obligations shall accrue to the estate or to the Trustee, either personally or the capacity as Trustee, as a result of any such abandonment and termination.

5. Conditions of Sale. The Broker agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

a. The Trustee is selling the Property in the capacity as the Trustee and not in the Trustee's personal

capacity, and no liability or obligations shall accrue to the Trustee personally as a result of any sale.

b. If for any reason, or no reason whatsoever, the Trustee is unable to deliver possession or title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property.

c. The Trustee is selling the Property in an "AS IS" condition or basis by quitclaim deed without any representations or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the subdividability of the Property.

d. The sale of the Property is subject to Bankruptcy Court approval after notice to the Debtor, the Debtor's counsel, the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

e. The sale is subject to overbids.

f. The purchaser shall, at the purchaser's sole expense, acquire any and all insurance policies that the purchaser desires to cover the Property. The Trustee does not agree to acquire or transfer any insurance policies to the purchaser.

g. The purchaser is to arrange for all financing of the acquisition of the Property before the close of escrow.

h. All escrow fees shall be shared and paid on a 50/50 basis by the Trustee and the purchaser.

i. The purchaser shall, at the purchaser's sole expense, install all smoke detectors, if any, as may be required by state or local law. The Trustee is not required to deliver to the purchaser a written statement of compliance with any applicable state and local law.

j. The purchaser shall, at purchaser's sole expense, obtain any and all pest control inspection repairs that purchaser deems appropriate.

k. If any local ordinance requires that the Property be brought into compliance with minimum energy conservation standards as a condition of sale or transfer, the purchaser shall comply with and pay for these requirements at purchaser's sole expense.

l. Any sale is subject to the following conditions being satisfied before the close of escrow:

(1) the Trustee must prevail with respect to any objections to the proposed sale; and

(2) the Trustee reserves the right to reject any and all offers which in his/her judgment are insufficient.

m. The Property is being sold subject to:

(1) All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow;

(2) Any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free of secured claims of record.

6. Payment of Commission. The commission to be paid to the Broker shall only be paid from the proceeds of the sale of the Property. The payment of the commission is subject to prior approval of the Bankruptcy Court.

7. Reduction of Listing Price and Extension of Term of Listing Agreement. The Trustee may, in the Trustee's sole discretion and business judgment and without further Court order, modify the Exclusive Authorization by reducing the listing price and/or extending the term of the Exclusive Authorization.

8. Entire Agreement. This Addendum and the Exclusive Authorization, to the extent that such Exclusive Authorization

is not contrary to the terms and conditions herein, constitute the entire contract between the parties. All prior agreements between the parties are incorporated into this agreement. Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this Addendum and the Exclusive Authorization constitute the complete, final and exclusive statement of the terms of the agreement and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any, involving this Addendum and the Exclusive Authorization.

9. Bankruptcy Court Jurisdiction. The Bankruptcy Court, sitting without a jury which is expressly waived, shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Exclusive Authorization. This Addendum and the Exclusive Authorization and any disputes related thereto shall be governed by California law.

# EXHIBIT "D"

**Updated 03/06/2019**

# First American Title Company

**4 First American Way**
**Santa Ana, CA 92707**
California Department of Insurance License No. 151

| | |
|---|---|
| Order Number: | O-SA-5713600 (dt) |
| Title Officer: | Debbie Tognetti |
| Phone: | (714)250-8579 |
| Fax No.: | (714)481-2956 |
| E-Mail: | FAHQ-RA-octitle3@firstam.com |
| Property: | 1020 E Providencia Avenue<br>Burbank, CA 91501 |

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. *The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties*. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of February 25, 2019 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

ALTA/CLTA Homeowner's (EAGLE) Policy of Title Insurance (2013) and ALTA Ext Loan Policy 1056.06 (06-17-06) if the land described is an improved residential lot or condominium unit on which there is located a one-to-four family residence; or ALTA Standard Owner's Policy 2006 (WRE 06-17-06) and the ALTA Loan Policy 2006 (06-17-06) if the land described is an unimproved residential lot or condominium unit

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

ALLIANCE FUNDING GROUP INC., A NEVADA CORPORATION

The estate or interest in the land hereinafter described or referred to covered by this Report is:

FEE

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1. General and special taxes and assessments for the fiscal year 2019-2020, a lien not yet due or payable.

2. General and special taxes and assessments for the fiscal year 2018-2019.

| | |
|---|---|
| First Installment: | $7,659.98, DELINQUENT |
| Penalty: | $765.99 |
| Second Installment: | $7,659.97, OPEN |
| Penalty: | $0.00 |
| Tax Rate Area: | 12-02530 |
| A. P. No.: | 5620-003-029 |

3. The lien of defaulted taxes for the fiscal year 2015-2016, and any subsequent delinquencies.

| | |
|---|---|
| Tax Rate Area: | 12-02530 |
| A. P. No.: | 5620-003-029 |
| Amount to redeem: | $46,427.27 |
| Valid through: | MARCH 2019 |
| Amount to redeem: | $46,938.78 |
| Valid through: | APRIL 2019 |

**Please contact the tax office to verify the payoff amount.**

4. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

5. A right of way, affecting Lot "A" for conducting water across said lot from a spring located on Block 127 to the land march on the map of Providencia and Scott Trust, recorded in Book 17, Page 15 Et Seq. of miscellaneous records of said county, as conveyed by David Burbank, to G.A. March, by deed dated January 15, 1885 and recorded in Book 133, Page 188 of Deeds.

6. Rights of way, affecting Lot "A", for conducting water from the "Reservoir located in the Northerly portion of Lot 1 of the lands participated by decree in Case No. 20211 superior court, as per map recorded in Book 951, Page 55 of Deeds, records of said county, to Lots 1, 2, 3 and 4 of the lands partition by said decree, to J. Downey Harvey, H.M. Gillis, George W. King and B.F. Kierulff", together with the right to maintain said pipe line in good order and repair and to enter in and upon said lots for said purposes provided that said pipe lines shall be so laid and constructed as not to interfere with the proper cultivation of the land, as established by said decree recorded as above mentioned, to which record reference is hereby made for particulars.

7. Covenants, conditions, restrictions and easements in the document recorded as Book 5927, Page 65 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, sexual orientation, familial status, disability, handicap, national origin, genetic information, gender, gender identity, gender expression, source of income (as defined in California Government Code § 12955(p)) or ancestry, to the extent such covenants, conditions or restrictions violation 42 U.S.C. § 3604(c) or California Government Code § 12955. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

8. Covenants, conditions, restrictions and easements in the document recorded as Book 7300, Page 46 and Book 7364, Page 151, both of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, sexual orientation, familial status, disability, handicap, national origin, genetic information, gender, gender identity, gender expression, source of income (as defined in California Government Code § 12955(p)) or ancestry, to the extent such covenants, conditions or restrictions violation 42 U.S.C. § 3604(c) or California Government Code § 12955. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

9. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 20, 2008, as INSTRUMENT NO. 08-2052677 of Official Records.

| | |
|---|---|
| Debtor: | ALLIANCE FUNDING GROUP INC DBA ALLIED MORTGAGE.COM |
| Year & No.: | 08/40607153 |
| Amount: | $152.36, and any other amounts due thereunder. |

10. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 13, 2009, as INSTRUMENT NO. 09-1712647 of Official Records.

| | |
|---|---|
| Debtor: | ALLIANCE FUNDING GROUP INC DBA ALLIED MORTGAGE.COM |
| Year & No.: | 09/40707132 |
| Amount: | $153.68, and any other amounts due thereunder. |

11. A deed of trust to secure an original indebtedness of $306,000.00 recorded December 23, 2009 as INSTRUMENT NO. 09-1957226 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | December 17, 2009 |
| Trustor: | ALLEN MELIKIAN |
| Trustee: | ORANGE COAST TITLE COMPANY OF SOUTHERN CALIFORNIA - LOS ANGELES DIVISION |
| Beneficiary: | KELLZI FAMILY TRUST |

According to the public records, the beneficial interest under the deed of trust was assigned to ALEXANDER USMANOV by assignment recorded October 11, 2016 as INSTRUMENT NO. 16-1240878 OF OFFICIAL RECORDS.

Notes:
a. If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, we will require all of the following prior to the recordation of any documents or the issuance of any policy of title insurance:
i. Original note and deed of trust.
ii. Payoff demand statement signed by all present beneficiaries.
iii. Request for reconveyance signed by all present beneficiaries.
b. If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.
c. If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company

A document recorded January 11, 2017 as INSTRUMENT NO. 17-41783 OF OFFICIAL RECORDS provides that TD FORECLOSURE SERVICES, INC. was substituted as trustee under the deed of trust.

A notice of default recorded January 11, 2017 as INSTRUMENT NO. 17-41784 OF OFFICIAL RECORDS.

A notice of trustee's sale recorded May 31, 2017 as INSTRUMENT NO. 17-597671 OF OFFICIAL RECORDS.

The effect of a document entitled "RESCISSION OF RECONVEYANCE & REINSTATEMENT OF DEED OF TRUST", recorded August 02, 2016 as INSTRUMENT NO. 16-904178 of Official Records.

12. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 17, 2010, as INSTRUMENT NO. 10-1649475 of Official Records.

| | |
|---|---|
| Debtor: | ALLIANCE FUNDING GROUP INC DBA ALLIED MORTGAGE.COM |
| Year & No.: | 10/40611816 |
| Amount: | $156.39, and any other amounts due thereunder. |

13. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded JANUARY 4, 2012, as INSTRUMENT NO. 12-8863 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP INC DBA ALLIED MORTGAGE.COM
    Year & No.: 11/40605569
    Amount: $160.73, and any other amounts due thereunder.

14. The effect of a document entitled "INTERSPOUSAL TRANSFER GRANT DEED", recorded March 11, 2013 as INSTRUMENT NO. 361982 OF OFFICIAL RECORDS.

    THE REQUIREMENT THE DOCUMENT IS RE-RECORDED TO INCLUDE A COMPLETE AND CORRECT LEGAL DESCRIPTION.

15. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578423 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP, INC
    Year & No.: 13/49121295
    Amount: $1,215.27, and any other amounts due thereunder.

16. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578424 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP, INC
    Year & No.: 13/49121299
    Amount: $2,667.53, and any other amounts due thereunder.

17. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578425 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP, INC
    Year & No.: 13/49121300
    Amount: $1,044.34, and any other amounts due thereunder.

18. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578426 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP, INC
    Year & No.: 13/49121301
    Amount: $438.12, and any other amounts due thereunder.

19. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578427 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP, INC
    Year & No.: 13/49121303
    Amount: $423.37, and any other amounts due thereunder.

20. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578428 of Official Records.
    Debtor: ALLIANCE FUNDING GROUP, INC

Year & No.: 13/49122701
Amount: $421.92, and any other amounts due thereunder.

21. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded NOVEMBER 6, 2013, as INSTRUMENT NO. 13-1578429 of Official Records.
Debtor: ALLIANCE FUNDING GROUP, INC
Year & No.: 13/49122702
Amount: $2,174.79, and any other amounts due thereunder.

22. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded DECEMBER 20, 2016, as INSTRUMENT NO. 16-1617361 of Official Records.
Debtor: ALLIANCE FUNDING GROUP INC
Year & No.: 16/40250384
Amount: $240.73, and any other amounts due thereunder.

23. A lien for unsecured property taxes, evidenced by a certificate recorded by the tax collector of Los Angeles County, recorded DECEMBER 20, 2016, as INSTRUMENT NO. 16-1617370 of Official Records.
Debtor: ALLIANCE FUNDING GROUP INC
Year & No.: 16/40250385
Amount: $651.16, and any other amounts due thereunder.

24. Proceedings pending in the Bankruptcy Court of the U.S. Bankruptcy Court Central District of California (San Fernando Valley) District of the U.S. District Court, California, entitled in re: ALLIANCE FUNDING GROUP INC., debtor, Case No. 1:17-bk-11888-MT, wherein a petition for relief was filed under Chapter 7 on JULY 17, 2017.

25. Water rights, claims or title to water, whether or not shown by the public records.

26. This transaction may be subject to a confidential order issued pursuant to the Bank Secrecy Act. Information necessary to comply with the confidential order must be provided prior to the closing. This transaction will not be insured until this information is submitted, reviewed and found to be complete.

**Prior to the issuance of any policy of title insurance, the Company will require:**

27. With respect to ALLIANCE FUNDING GROUP INC., a corporation:
a. A certificate of good standing of recent date issued by the Secretary of State of the corporation's state of domicile.
b. A certified copy of a resolution of the Board of Directors authorizing the contemplated transaction and designating which corporate officers shall have the power to execute on behalf of the corporation.
c. Other requirements which the Company may impose following its review of the material required herein and other information which the Company may require.

28. With respect to ALLIANCE FUNDING GROUP INC., A NEVADA CORPORATION, a certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.

## INFORMATIONAL NOTES

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

1. This report is preparatory to the issuance of an ALTA Loan Policy. We have no knowledge of any fact which would preclude the issuance of the policy with CLTA endorsement forms 100 and 116 and if applicable, 115 and 116.2 attached.

   When issued, the CLTA endorsement form 116 or 116.2, if applicable will reference a(n) Single Family Residence known as 1020 E PROVIDENCIA AVENUE, BURBANK, CA.

2. According to the public records, there has been no conveyance of the land within a period of twenty four months prior to the date of this report, except as follows:

   A document recorded June 05, 2017 as INSTRUMENT NO. 17-615955 OF OFFICIAL RECORDS
   From: MKRCHYAN INVESTMENTS, LP
   To: ARTHUR NAGAPETYAN, A SINGLE MAN

   NOTE to proposed insured lender only: No Private transfer fee covenant, as defined in Federal Housing Finance Agency Final Rule 12 CFR Part 1228, that was created and first appears in the Public Records on or after February 8, 2011, encumbers the Title except as follows: None

The map attached, if any, may or may not be a survey of the land depicted hereon. First American expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

## LEGAL DESCRIPTION

Real property in the City of Burbank, County of Los Angeles, State of California, described as follows:

THAT PART OF LOT 1 OF TRACT NO. 3514, IN THE CITY OF BURBANK, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 40, PAGE 34 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, ALSO THAT PORTION OF LOT "A" OF TRACT NO. 3592, IN SAID CITY, AND STATE, AS PER MAP RECORDED IN BOOK 40, PAGE 63 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT A POINT IN THE WESTERLY LINE OF SAID LOT 1 OF TRACT NO. 3514, DISTANCE THEREON 202.62 FEET NORTHERLY FROM THE MOST WESTERLY CORNER OF SAID LOT; THENCE NORTHERLY ALONG SAID WESTERLY LINE OF LOT 1 AND THE WESTERLY LINE OF SAID LOT "A" OF TRACT NO. 3592, 50 FEET TO A POINT WHICH IS DISTANT THEREON, 50 FEET SOUTHERLY FROM THE MOST NORTHERLY CORNER OF SAID LOT "A"; THENCE SOUTHEASTERLY TO THE MOST EASTERLY CORNER OF SAID LOT 1 OF TRACT NO. 3514; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT 1, 56.97 FEET TO A POINT, WHICH IS 202.62 FEET NORTHEASTERLY FROM THE SOUTHERLY CORNER OF SAID LOT 1; THENCE WESTERLY TO THE POINT OF BEGINNING.

APN: 5620-003-029

Order Number: **O-SA-5713600**
Page Number: 9



***NOTICE***

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

**EXHIBIT A**
**LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (BY POLICY TYPE)**

## CLTA STANDARD COVERAGE POLICY – 1990

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public, records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)

EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;

d. improvements on the Land;
e. land division; and
f. environmental protection.
This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $10,000 |
| Covered Risk 18: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 19: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 21: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $5,000 |

**2006 ALTA LOAN POLICY (06-17-06)**

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

EXCEPTIONS FROM COVERAGE

[Except as provided in Schedule B - Part II,[ t[or T]his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

**[PART I**

[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**PART II**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]

**2006 ALTA OWNER'S POLICY (06-17-06)**

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 or 10); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.
7. [Variable exceptions such as taxes, easements, CC&R's, etc. shown here.]

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)**

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the

Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

First American Title

**Privacy Information**

**We Are Committed to Safeguarding Customer Information**

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**

This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values.

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**

First American Financial Corporation is sensitive to privacy issues on the Internet. We believe it is important you know how we treat the information about you we receive on the Internet.

In general, you can visit First American or its affiliates' Web sites on the World Wide Web without telling us who you are or revealing any information about yourself. Our Web servers collect the domain names, not the e-mail addresses, of visitors. This information is aggregated to measure the number of visits, average time spent on the site, pages viewed and similar information. First American uses this information to measure the use of our site and to develop ideas to improve the content of our site.

There are times, however, when we may need information from you, such as your name and email address. When information is needed, we will use our best efforts to let you know at the time of collection how we will use the personal information. Usually, the personal information we collect is used only by us to respond to your inquiry, process an order or allow you to access specific account/profile information. If you choose to share any personal information with us, we will only use it in accordance with the policies outlined above.

**Business Relationships**

First American Financial Corporation's site and its affiliates' sites may contain links to other Web sites. While we try to link only to sites that share our high standards and respect for privacy, we are not responsible for the content or the privacy practices employed by other sites.

**Cookies**

Some of First American's Web sites may make use of "cookie" technology to measure site activity and to customize information to your personal tastes. A cookie is an element of data that a Web site can send to your browser, which may then store the cookie on your hard drive.

FirstAm.com uses stored cookies. The goal of this technology is to better serve you when visiting our site, save you time when you are here and to provide you with a more meaningful and productive Web site experience.

--------------------------------------------------------------------------------

**Fair Information Values**

**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** We believe we should behave responsibly when we use information about a consumer in our business. We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy. We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.

Form 50-PRIVACY (9/1/10) Page 1 of 1 Privacy Information (2001-2010 First American Financial Corporation)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367.

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION BY CHAPTER 7 TRUSTEE TO: (1) APPROVE SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES WITH SUCH LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES TO ATTACH TO PROCEEDS PURSUANT TO 11 U.S.C. §§ 363(b) AND (f); (2) APPROVE OVERBID PROCEDURES; AND (3) DETERMINE THAT BUYER IS ENTITLED TO PROTECTION PURSUANT TO 11 U.S.C. § 363(m)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **May 15, 2019**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Stephen F Biegenzahn efile@sfblaw.com
- Raffy M Boulgourjian rboulgourjian@gmail.com
- Reagan E Boyce rboyce@cr.law
- Richard Burstein rburstein@bg.law, ecf@bg.law
- Renata A Guidry rguidry@erlaw.com
- Eamon Jafari jafari@barringtonlegal.com, gould@barringtonlegal.com
- David Seror (TR) aquijano@bg.law, C133@ecfcbis.com
- United States Trustee (SV) ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **May 15, 2019**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **May 16, 2019**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Maureen A. Tighe
United States Bankruptcy Court
21041 Burbank Blvd., Suite 324
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 15, 2019 | KRISTINA DOW | /s/ Kristina Dow |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**2. <u>SERVED BY UNITED STATES MAIL</u>:**

Razmik Aslanjan aka
Razmik Aslanyin
1020 E. Providencia Avenue
Burbank, CA 91501

Alexander Usmanov
17777 Ventura Blvd., Ste. 220
Encino, CA 91316

Natalia Usmanova
17777 Ventura Blvd., Ste. 220
Encino, CA 91316